UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 09-33264-H2-7 |
| **TONY DEROSA-GRUND,** | § | (Chapter 7) |
| | § | |
| Debtor. | § | |

**OPPOSITION OF NEW LINE PRODUCTIONS, INC. TO MOTION TO
REOPEN CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 350**
[This Opposition Relates to Dkt. No. 92]

**To the Honorable Jeff Bohm,
United States Bankruptcy Judge:**

New Line Productions, Inc. ("New Line"), by and through its undersigned counsel, hereby files this opposition (the "Opposition") to the *Motion to Reopen Chapter 7 Case Pursuant to 11 U.S.C. § 350* (the "Motion")[1] filed by Tony Derosa-Grund ("TDG" or "Debtor"). In support of the Opposition, New Line respectfully represents as follows:

**PRELIMINARY STATEMENT**

TDG maintained throughout his Chapter 7 bankruptcy case that the Conjuring Treatment (defined below) was owned by a separate entity in order to shield it from his bankruptcy estate and to reap the benefits from its sale to New Line (which he did). Now that the movie *The Conjuring* has generated hundreds of millions of dollars in profits and TDG and the TDG Companies have lost a JAMS arbitration over the rights to *The Conjuring* project, TDG has done an about-face, claiming that he personally owns the Conjuring Treatment, presumably hoping that he can use the bankruptcy process to avoid the JAMS decision and recover any surplus after the claims in his bankruptcy estate are satisfied. This Motion is an improper attempt to manipulate the bankruptcy process and should be denied.

---

[1] Docket No. 92.

**BACKGROUND**

**I.    Procedural History**

1. On May 27, 2009, an involuntary bankruptcy case under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") was instituted against TDG in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

2. On June 8, 2009, the Order for Relief was entered by the Court.[2]

3. On June 15, 2009, David Askanase was appointed as chapter 7 trustee of the estate (the "Chapter 7 Trustee").

4. On September 25, 2013, the Chapter 7 Trustee filed his Final Report, showing gross receipts of $100,013.67.[3]

5. On March 26, 2014, the Chapter 7 Trustee filed his *Final Account and Distribution Report Certification that the Estate has been Fully Administered and Application to be Discharged*.[4]

6. On May 8, 2014, the Court entered the Final Decree and the Debtor's bankruptcy case (the "TDG Bankruptcy Case") was closed.[5]

**II.    Factual Background**

　　A.    TDG's Efforts To Sell The Conjuring Treatment

7. In or around 1992, TDG developed and wrote a motion picture treatment (the "Conjuring Treatment") based upon discussions with Ed and Lorraine Warren, allegedly "well-known" paranormal investigators, regarding certain of their case files. The Conjuring

---

[2]    Docket No. 11.

[3]    Docket No. 74. The Chapter 7 Trustee filed an amended Final Report on October 18, 2015. Docket No. 82.

[4]    Docket No. 88.

[5]    Docket No. 90.

Treatment states, on each page, "The Conjuring © Tony DeRosa-Grund 1992 All Rights Reserved[.]"

8. Silverbird Media Corp. ("Silverbird"), a closely-held company owned by TDG, owned all rights, title and interest in the Conjuring Treatment (collectively, the "Conjuring Rights").[6]

9. Beginning in 2009, TDG began shopping the sale of the Conjuring Rights to various motion picture studios.[7]

10. On January 26, 2009, the DreamWorks studio reviewed the Conjuring Treatment, but in a letter addressed to TDG, turned down the project.[8]

11. On February 9, 2009, Gold Circle sent an agreement to TDG to purchase the Conjuring Rights.[9] TDG did not accept the proposal from Gold Circle.

12. On February 12, 2009, TDG formed Evergreen Media Group, LLC ("Evergreen"). Following its formation, Evergreen acquired the Conjuring Rights from Silverbird.[10]

13. In or around June 2009, TDG pitched the Conjuring Treatment to "nine (9) major Hollywood motion picture studios."[11]

---

[6] *See* Declaration of Michael J. O'Connor ("O'Connor Decl.") Ex. A (2/9/09 Assignment).

[7] *See id.* Ex. B, ¶ 13 (TDG Decl. dated 9/23/14) ("In early 2009 I [TDG] contacted Paul Brooks, president of Gold Circle Films, and sent him my story and treatment for Perron Farmhouse Case File").

[8] *See id.* Ex. B, ¶ 12, Ex. 1.

[9] *See id.* Ex. B, ¶ 13, Ex. 2.

[10] *See id.* Ex. A.

[11] *See id.* Ex. B, ¶ 19.

14. On June 30, 2009, TDG's step-daughter, Emily Margotta, created Evergreen Media Holdings, LLC ("EMH" and together with Silverbird and Evergreen, the "TDG Companies").[12] After its formation, EMH acquired the Conjuring Rights from Evergreen.[13]

B. TDG's Sale Of The Conjuring Rights to New Line

15. On July 10, 2009, TDG filed his schedules of assets and liabilities in the TDG Bankruptcy Case (the "Bankruptcy Schedules").[14] TDG did not include the Conjuring Treatment as an asset on the Bankruptcy Schedules.[15]

16. Around the same time, New Line entered into negotiations with TDG and the TDG Companies to purchase the Conjuring Rights.[16]

17. In light of the TDG Bankruptcy Case, New Line determined that it was prudent and necessary to obtain the consent of the Chapter 7 Trustee and the Court regarding the potential sale of the Conjuring Rights.

18. On November 11, 2009, New Line, TDG and the TDG Companies reached an agreement on deal terms for New Line to purchase the Conjuring Rights. The purchase was contingent upon New Line receiving a release from the Chapter 7 Trustee in the TDG Bankruptcy Case.[17]

19. On December 22, 2009, the Chapter 7 Trustee filed the *Motion to Approve Agreement Between Trustee and Evergreen Media Holdings, LLC, New Line Productions, Inc.,*

---

[12] Docket No. 33, ¶ 3; *see also* O'Connor Decl. Ex. C at pp. 33:3-17, 34:11-35:12, 36:18-25.

[13] Docket No. 33 ¶ 3.

[14] *See* Schedules of Assets and Liabilities. Docket No. 19.

[15] *See id.*

[16] O'Connor Decl. Ex. B, ¶¶ 21-22.

[17] *See* Docket No. 33-1, p. 1 ¶ 2 ("The parties agree that the items in the following sentence will be conditions precedent to NL's obligation to make any payments in respect of the rights acquisition or any producer services. NL's approval of the chain of title (including bankruptcy court approval)[.]")

4

*Peter Safran, and Tony DeRosa-Grund* (the "Settlement Motion").[18] The Chapter 7 Trustee stated in the Settlement Motion that TDG maintained that "because Debtor's family trust purportedly owns Evergreen Media Holdings and because the deal was entered into post-petition, the Estate lacks any interest in the rights related to the movie."[19] The Chapter 7 Trustee further stated that he had not yet had an opportunity to research potential claims that TDG's bankruptcy estate may have had against EMH.[20]

20. Under the Settlement Motion, the Chapter 7 Trustee agreed to accept $100,000 from New Line in exchange for a release by the Chapter 7 Trustee of any and all injunctive claims which the Chapter 7 Trustee, on behalf of TDG's bankruptcy estate, may have against New Line relating to the transfer of the Conjuring Rights.[21] The Chapter 7 Trustee further reserved all rights of the TDG bankruptcy estate against TDG, EMH, "and all other persons and entities, save New Line."[22]

21. On January 27, 2010, the Court entered an order (the "Settlement Approval Order") approving the Settlement Motion.[23] The Settlement Approval Order authorized the Chapter 7 Trustee to (i) release any claims for injunctive relief that the Debtor's bankruptcy estate has or may have against New Line arising out of the transfer of the Conjuring

---

[18]   Docket No. 33.
[19]   *Id.* ¶ 4.
[20]   *Id.* ¶ 5.
[21]   *Id.*
[22]   *Id.* ¶ 6.
[23]   Docket No. 38.

5

Rights, and (ii) accept $100,000 from New Line in full satisfaction and release of any such claims.[24]

22. In March 2010, TDG and the TDG Companies entered into the Option Quitclaim Agreement ("OQA") with New Line for the sale of the Conjuring Rights.[25] The OQA provides in relevant part:

> GRANT OF RIGHTS: Company [defined to include TDG, EMG, EMH, and Silverbird collectively and without further delineation] hereby sells, grants, conveys and assigns to New Line exclusively . . . **all right, title and interest in the Property** (all of the foregoing being collectively referred to as the " Rights" ) in and to the Property . . .[26]

The term "Property" under the OQA incorporates several defined terms, including all of the "Literary Material" in connection with "The Conjuring" project.[27]

23. Also in March 2010, TDG and EMH entered into the Producer Loanout Agreement ("PLA") with New Line.[28]

24. On October 7, 2010, following the sale of the Conjuring Rights to New Line, TDG alleged that *The Conjuring* movie is based upon the Conjuring Treatment and that he should be "credited/paid for that work."[29]

25. On February 7, 2011, TDG and the TDG Companies entered into an Amendment to the OQA, which expressly granted the Conjuring Treatment to New Line and

---

[24] The $100,000 received by the Chapter 7 Trustee from New Line was the basis of the distributions made to TDG's creditors during the bankruptcy case.

[25] *See* O'Connor Decl. Ex. D (OQA). The OQA is dated November 11, 2009, to memorialize the date on which the parties came to an agreement with respect to the terms of a deal.

[26] *See id.* Ex. D, ¶ 7 (emphasis added).

[27] *See id.* Ex. D, ¶ 1A.

[28] *See id.* Ex. E (PLA).

[29] *See id.* Ex. F (email dated 10/7/10).

6

released any claims against New Line.[30] The Amendment to the OQA provides that, "if DeRosa-Grund contributed any oral or written material to the screenplay for the motion picture currently entitled 'The Conjuring' (including, but not limited to, a **treatment)**, such material is **owned and controlled by [New Line]**[.]"[31]

26. As consideration for the sale of the Conjuring Rights by TDG, New Line paid TDG and the TDG Companies $460,000 under the OQA and $500,000 under the PLA.[32] Additionally, TDG and the TDG Companies were paid $750,000 under the OQA for the movie *Annabelle*.[33] No revenues from the OQA and PLA were paid to the Debtor's estate or to its creditors.[34]

C. The JAMS Arbitration And Related Litigation

27. On June 5, 2013, New Line initiated a JAMS Arbitration against TDG and the TDG Companies based upon their breach of various terms of the OQA and PLA.[35]

28. On July 17, 2013, *The Conjuring* movie was released.[36] *The Conjuring* has grossed over $318 million worldwide.

29. On March 28, 2014, TDG and EMH instituted an action against New Line, arguing that New Line should have submitted the Conjuring Treatment to the Writer's Guild of America ("WGA") for credit on *The Conjuring*.[37]

---

[30] *See* O'Connor Decl. Ex. G (Amendment to OQA ), ¶ 24.

[31] *See id.* (emphasis added).

[32] *See id.* Exs. E, ¶ 4(b) ($500,000), H ($75,000), I ($385,000).

[33] *See id.* Ex. J ($750,000).

[34] *See id.* Ex. C at 15:10-24.

[35] *See id.* Ex. J.

[36] *See id.* Ex. B, ¶ 46.

[37] *See id.* Ex. K, ¶¶ 16, 18-19, 87-91.

7

30. On February 5, 2015, Judge Terry Friedman (ret.), as arbitrator (the "Arbitrator"), issued a Final Award in the JAMS Arbitration. At issue in the JAMS Arbitration was what rights, if any, TDG and the TDG Companies retained in "The Conjuring" project. The Arbitrator determined that TDG "retained no rights whatsoever in 'The Conjuring' project," including The Conjuring Treatment.[38] Specifically, the Arbitrator found the following:

> The Quitclaim and PLA clearly, repeatedly, consistently and unequivocally grant all right to "the Conjuring" project, including all copyright and trademark rights, to New Line, except as quitclaimed or assigned back to [TDG and the TDG Companies]. This is what the words say and how the entertainment industry does business. On their face, even to a layperson, the terms "all right, title and interest" and "any and all rights and interest of any type and nature whatsoever heretofore or hereafter acquired" appear to be all-inclusive.
> ….
> It is unsurprising that such terms have been adopted as the custom and practice in the entertainment industry when a production company, studio or distributor seeks to acquire intellectual property rights, and especially so when the acquiring party is a studio that plans to spend millions of dollars to exploit the property … Any other interpretation of the Agreements would be absurd.[39]

The Arbitrator further found that the release in the Amendment to the OQA, which expressly granted the Conjuring Treatment to New Line, was a complete bar to TDG's claim that New Line violated the Lanham Act by failing to submit the Conjuring Treatment to the WGA.[40]

31. On February 15, 2015, TDG and the TDG Companies appealed the Final Award.[41] The appeal of the Final Award is currently pending.

---

[38] *See* O'Connor Decl. Ex. L (Final Award), p. 31 (information related to third parties has been redacted). The "specifically reserved" rights in the Final Award refer to certain television rights TDG and the TDG Companies were granted under the Agreements and are wholly irrelevant to the issue of who owns the Conjuring Treatment.

[39] *Id.* Ex. L, p. 23.

[40] *Id.* Ex. L, pp. 27-28.

[41] *Id.* Ex. M (JAMS Appeal) (information related to third parties has been redacted).

D.      TDG's Recent Actions To Collect On The Conjuring Treatment

32. On June 3, 2015, TDG applied to register a copyright for the Conjuring Treatment with the United States Copyright Office, application no. 1-2551067721 (the "Alleged Copyright"). Upon information and belief, the Alleged Copyright application is pending.

33. On July 20, 2015, TDG threatened to reopen the TDG Bankruptcy Case and to commence additional lawsuits if New Line did not settle the JAMS Arbitration and other pending lawsuits.[42] This was the first time that TDG *ever* claimed that the Conjuring Treatment should be included in the TDG Bankruptcy Case and was only made *after* binding arbitration determined that New Line owned all rights, title and interest to the Conjuring Treatment.[43]

34. On August 7, 2015, TDG filed a Complaint against New Line (and others) in the District Court for the Southern District of Texas, alleging, among other things, copyright infringement based upon the Conjuring Treatment (the "Claimed Infringement Lawsuit").

---

[42] O'Connor Decl. Ex. N (letter dated 7/20/15) (information related to third parties has been redacted). The July 20, 2015 letter is being offered to show that TDG filed the Motion to gain leverage in other litigations between the parties. Federal Rule of Evidence 408(a) prohibits the introduction of settlement negotiations to: (1) prove the validity or amount of a disputed claim; or (2) to impeach by a prior inconstant statement or a contradiction. However, Rule 408(b) provides that the court may "admit this evidence for another purpose, such as proving a witness's bias or prejudice . . . ." The Fifth Circuit has noted that "[t]he district court has discretion to admit evidence of a settlement for other purposes." *Kennon v. Slipstreamer, Inc.*, 794 F.2d 1067, 1069-70 (5th Cir. 1986) (disclosure of the fact of settlement permitted for purpose of avoiding jury confusion) (citations omitted). Texas district court have permitted the introduction of settlement negotiations under Rule 408(b) under certain circumstances. *See e.g.*, *White Rosebay Shipping S.A. v. HNA Grp. Co.*, No. CA C-12-096, 2012 WL 6629891, at *3 (S.D. Tex. Dec. 18, 2012) (settlement negotiation admissible under Rule 408(b) to establish alter ego); *see also In re Eastman*, 512 B.R. 832, 839-40 (Bankr. W.D. Tex. 2009), as amended (Apr. 28, 2009) (letter admissible to prove violation of discharge injunction). Other district courts have recognized that proof of improper motive is a valid reason to introduce evidence under Rule 408. *See Great Rock Golf 2006, LLC v. Town of Riverhead,* No. 12-CV-3585 SJF WDW, 2013 WL 3788606, at *7 (E.D.N.Y. July 18, 2013) (settlement agreements may be admissible to prove "knowledge, motive, and intent") (internal quotations omitted); *accord ESPN, Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 413 (S.D.N.Y. 1999) ("settlement materials" deemed admissible for purposes of proving "improper motive"); *see also York v. Ferris State Univ.*, 36 F. Supp. 2d 976, 980 (W.D. Mich. 1998) (motion to strike based on Rule 408 denied where evidence offered for the purpose of showing the defendant's motive).

[43] *See* O'Connor Decl. Ex. L, p. 31.

9

E. TDG's Motion to Reopen the Closed TDG Bankruptcy Case

35. On September 23, 2015, TDG filed the Motion, seeking to reopen the TDG Bankruptcy Case. In the Motion, TDG seeks permission to amend his schedules "to include a copyright to a motion picture treatment that was written prior to his petition date, and was inadvertently omitted from his schedules."[44] TDG further maintains that the Claimed Infringement Lawsuit is an asset of his estate.[45]

## ARGUMENT

### I. The Doctrine of Judicial Estoppel Prevents TDG From Reopening the TDG Bankruptcy Case to Administer a Known Asset

36. The Motion should be denied. The attendant facts and circumstances, as set forth above, and applicable precedent from the Fifth Circuit Court of Appeals (the "Fifth Circuit") and this Court,[46] estop TDG from reopening the TDG Bankruptcy Case.

37. Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation.[47] It is generally invoked when "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice."[48]

38. The Fifth Circuit has recognized three factors to determine whether judicial estoppel applies:

(a) The party asserting the claim is taking a position that is clearly inconsistent with a position taken in a previous proceeding;

---

[44] Motion, ¶ 6.

[45] *Id.*, ¶ 8.

[46] *See In re Walker,* 323 B.R. 188, 194 (Bankr. S.D. Tex. 2005) ("*Walker*").

[47] *Stacey D v. Primary P&I Underwriters (In re Superior Crewboats),* 374 F.3d 330, 334 (5th Cir. 2004) ("*Superior Crewboats*").

[48] *Id. (citing Matter of Cassidy,* 892 F.2d 637, 641 (7th Cir. 1990)).

    (b)  The court accepted the previous position; and

    (c)  The non-disclosure was not inadvertent.[49]

Each of the requirements for judicial estoppel exist with respect to the Motion.

   39.  The first factor—whether the party asserting the claim is taking a position inconsistent with a previous position—can be met in the context of a bankruptcy case by a debtor's omission of a claim from his bankruptcy schedules, which is "tantamount to representing that the claim did not exist."[50] In *Superior Crewboats,* a case whose facts are on point with those here, the Fifth Circuit considered whether the debtors should be judicially estopped from reopening their bankruptcy case and proceeding with a state-court lawsuit.[51] There, the debtors initially excluded a personal injury lawsuit from their bankruptcy schedules, but thereafter contended in state court that it was worth $2.5 million.[52] The Fifth Circuit, in reversing a lower court order permitting the reopening of the case, found that "[s]uch blatant inconsistency readily satisfies the first prong of the judicial estoppel inquiry."[53]

   40.  Here, as stated above, TDG did not include the Conjuring Treatment in his Bankruptcy Schedules. TDG thus effectively represented to this Court that he held no personal interest in the Conjuring Treatment and that it was not property of the Debtor's bankruptcy estate.[54] TDG stated instead that the Conjuring Treatment was owned by EMH, and consistently maintained this position throughout the TDG Bankruptcy Case. The Chapter 7 Trustee expressly

---

[49]  *Id.*

[50]  *Walker,* 323 B.R. at 195 (finding that the first prong to be satisfied based upon the debtor's failure to disclose her personal injury cause of action in her schedules and during the pendency of the case, as such failure was inconsistent with the position being taken in her motion to reopen the case).

[51]  *See Superior Crewboats,* 374 F.3d at 334.

[52]  *Id.*

[53]  *Id.*

[54]  *See Walker,* 323 B.R. at 195.

11

relied on TDG's representation regarding ownership of the Conjuring Treatment in determining to enter into the settlement with New Line and to release any claims for injunctive relief that the Debtor's estate may have against New Line based thereon.[55]

41. In contrast, TDG now asserts that the Alleged Copyright and the Claimed Infringement Lawsuit, both of which derive entirely from the Conjuring Treatment, are property of the Debtor's bankruptcy estate. This assertion cannot be reconciled with his prior representations[56] and his intentional exclusion of the Conjuring Treatment from his Bankruptcy Schedules. Now that *The Conjuring* movie has grossed more than $300 million worldwide, TDG, similar to the debtors in *Superior Crewboats*, asserts that he "inadvertently" excluded the Alleged Copyright and the Claimed Infringement Lawsuit from his Bankruptcy Schedules. This assertion is inconsistent with the positions previously taken by TDG and readily satisfies the first prong of the Fifth Circuit's test for the application of judicial estoppel.

42. The second prong of the analysis—whether the court accepted the previous position—is satisfied here as well. An order granting the debtor a discharge constitutes an acceptance by a bankruptcy court of a debtor's representations as to the assets which constitute his bankruptcy estate.[57] Here, the Court granted TDG a discharge and closed the TDG Bankruptcy Case on May 8, 2014.[58] At that point, the Court accepted TDG's earlier position that

---

[55] Docket No. 33, ¶ 5.

[56] As noted above in ¶ 25 of this Opposition, following the entry of the Settlement Approval Order by the Court and the sale of the Conjuring Rights to New Line, TDG and New Line agreed, in the amendment to the OQA, that any material related to the movie *The Conjuring*, including any treatment, "is owned and controlled by New Line." TDG affirmatively recognized, therefore, that he did not own the Conjuring Treatment.

[57] *See e.g., Superior Crewboats,* 374 F.3d at 336 (the bankruptcy court adopted the position when the trustee abandoned the claim and the court issued a "no asset" discharge); *Walker,* 323 B.R. at 195 (finding that the second prong is satisfied where the court signed an order granting a discharge to the debtor and signed a final decree closing the debtor's case).

[58] Docket No. 90.

12

the Conjuring Treatment was not an asset of his bankruptcy estate. The Court further accepted the exclusion of the Conjuring Treatment from the Debtor's estate when it entered the Order approving the Settlement Motion. The entry of these orders by the Court sufficed to meet the second prong of the Fifth Circuit's judicial estoppel analysis.

43. The third prong of the judicial estoppel test requires that the failure to disclose not be inadvertent. An inadvertent failure to disclose can be shown when the debtor either (a) lacks knowledge of the claim; or (b) has no motive for concealment.[59] Neither factor exists here. The facts here make clear that TDG deliberately omitted the Conjuring Treatment from his Bankruptcy Schedules. The Alleged Copyright and the Claimed Infringement Lawsuit are based upon the Conjuring Treatment, which TDG maintained throughout his bankruptcy was not an asset of the Debtor's bankruptcy estate.

44. TDG was therefore fully aware of any potential claims based upon the Conjuring Treatment at the time of his bankruptcy. In addition, TDG had every motivation to conceal the Alleged Copyright, as any value related thereto would otherwise be distributed to his creditors.[60] As it stands, TDG received approximately $1.71 million under the OQA and PLA. None of those funds have been disbursed to his estate or creditors. The third prong of the Fifth Circuit's judicial estoppel analysis has been satisfied here.

45. The issues presented by the Motion are indistinguishable from those considered by this Court in *Walker*. The debtor there failed to disclose a potential tort claim in her schedules. She filed her lawsuit after she had received an order of discharge and her

---

[59] *See Superior Crewboats,* 374 F.3d at 336 (the non-disclosure was not inadvertent as the debtors had knowledge of the claim and were motivated to conceal the claim in order to reap a windfall had they been able to recover on the undisclosed claim); *Walker,* 323 B.R. at 196.

[60] *See Walker,* 323 B.R. at 196 (finding that debtor "had the requisite motivation to conceal the claim, as she would certainly obtain a windfall had she been able to recover on the undisclosed claim without first allowing her creditors to assert an interest in the proceeds").

bankruptcy case had been closed. However, following the dismissal of her lawsuit for lack of standing (since it should have been an asset of her bankruptcy estate), she sought to reopen her bankruptcy case so that it could be administered by the bankruptcy trustee.[61]

46. This Court denied the motion to reopen the case, finding that the doctrine of judicial estoppel squarely applied to the debtor's conduct. This Court found the first two prongs of the Fifth Circuit test---representation and judicial acceptance---were easily satisfied by the exclusion of the potential cause of action from her schedules, and the order granting a discharge.[62] As for the third prong, that the nondisclosure not be inadvertent, this Court observed that the debtor had chosen to come back to the bankruptcy court only after her tort litigation had been dismissed for lack of standing. "Under current Fifth Circuit analysis," this Court wrote, "such reckless disregard of the Debtor's express, affirmative duty to disclose satisfies the third prong and requires application of judicial estoppel."[63]

47. *Superior Crewboats* and *Walker* mandate the denial of the Motion. Indeed, the facts set forth above in this Opposition warrant the application of judicial estoppel here even more so than in those cases.

48. Well aware of the significant profits generated by the movie *The Conjuring*, TDG in the Motion takes a position with respect to the Alleged Copyright and the Claimed Infringement Lawsuit that is fundamentally at odds with his representations regarding the Conjuring Treatment in the TDG Bankruptcy Case. TDG presumably hopes that a recovery from the Claimed Infringement Lawsuit would substantially exceed the approximately

---

[61] *Id.* at 193.

[62] *Id.* at 195.

[63] *Id.* at 196.

$1.5 million in claims against his bankruptcy estate, with TDG to receive any surplus.[64] It is clear that TDG was motivated throughout the TDG Bankruptcy Case to maintain that the Conjuring Treatment was owned by a separate entity,[65] and to reap all the profits therefrom. TDG is now attempting to use this Court and the bankruptcy process to assist in his meritless claims against New Line and to garner additional recoveries from the Conjuring Treatment through the Alleged Copyright and the Claimed Infringement Lawsuit. The Court in *Walker* found that "bad faith" is not a requisite element of judicial estoppel.[66] However, just as in *Walker*, TDG's actions here demonstrate "the kind of gross omission and reckless disregard that alone satisfies the 'bad faith' element necessary to find judicial estoppel."[67]

49. Even if the Alleged Copyright and the Claimed Infringement Lawsuit were to have any value for the benefit of creditors of the bankruptcy estate (which they do not), it would not in any way vitiate the need to apply judicial estoppel here against TDG. As this Court noted in *Walker*:

> "The integrity of the bankruptcy system rests on full and honest disclosure by debtors of all of their assets" .... This Court finds credibility in this rationale for invoking judicial estoppel to prevent a debtor who failed to disclose a cause of action from later reopening her case to schedule the claim .... Allowing the Debtor to backup, reopen the bankruptcy case, and amend her schedules only after she was caught would send a message that debtors should hide their claims until challenged. The Court will not open the door for such a scenario; judicial estoppel was designed to avoid this result.[68]

---

[64]     *See* 11 U.S.C. § 726(a)(6).

[65]     As noted above in ¶ 19, TDG maintained throughout the TDG Bankruptcy Case, including in connection with the Settlement Motion, that the Conjuring Rights were owned by EMH, an entity owned by TDG's step-daughter.

[66]     *Id*. at 197.

[67]     *Id*.

[68]     *Id*. at 198 (citations omitted).

50. Based upon the foregoing, New Line submits that each of the requirements for judicial estoppel has been satisfied. For the reasons articulated by the Fifth Circuit in *Superior Crewboats* and this Court in *Walker*, TDG should be prohibited from reopening the TDG Bankruptcy Case. The Motion should be denied.

## II. No Basis Exists to Warrant the Reopening of the TDG Bankruptcy Case

51. As set forth above, the doctrine of judicial estoppel, as articulated by the Fifth Circuit in *Superior Crewboats* and applied by this Court in *Walker,* requires denial of the Motion. However, even if TDG were not estopped from seeking to reopen the TDG Bankruptcy Case, the Motion should still fail, for the simple reason that TDG has failed to demonstrate or submit any evidence sufficient to warrant the relief that the Motion seeks.

52. Section 350(b) of the Bankruptcy Code authorizes a bankruptcy court to reopen a case in order to administer assets, to accord relief to the debtor, or for other cause.[69] The court has discretion to reopen an estate whenever *prima facie* proof is made that the estate has not been fully administered.[70]

53. In order to provide a basis to reopen a bankruptcy case, the asset to be administered must be an asset that was not known at the time of the bankruptcy.[71] The Fifth Circuit has also held that the longer the time period between the closing of the estate and the motion to reopen, the more compelling the reason for reopening the estate should be.[72] Moreover, a court should only grant a motion to reopen "where assets of such 'probability,

---

[69] 11 U.S.C. § 350(b).

[70] *Lopez v. Specialty Restaurants Corp.,* 283 B.R. 22, 27 (9th Cir. 2002).

[71] *See Miller v. Shallowford Community Hospital,* 767 F.2d 1556, 1559 n.4 (11th Cir. 1985) (a lawsuit properly abandoned by the trustee did not constitute unadministered assets under section 350(b) of the Bankruptcy Code).

[72] *Matter of Case,* 937 F.2d 1014, 1018 (5th Cir. 1991) ("*Case*").

16

administrability, and substance' appear to exist as to make it unreasonable under all circumstances for the court not to deal with them."[73] Conversely, as the Fifth Circuit has stated, where the chance of any recovery for creditors appears "too remote to make the effort worth the risk,"[74] a court does not abuse its discretion in denying a motion to reopen.[75]

### A. The Alleged Copyright Was Known by TDG at the Time of the Petition Date

54. Here, as set forth above, TDG had full knowledge of the Conjuring Treatment, the basis for the Alleged Copyright and the Claimed Infringement Lawsuit. TDG's interest in the Conjuring Treatment was specifically addressed in the TDG Bankruptcy Case when New Line conditioned the purchase of the Conjuring Rights on its ability to obtain a release from the Chapter 7 Trustee. The Conjuring Treatment dated 1992 was known to TDG at the time of the TDG Bankruptcy Case. None of the Conjuring Treatment, the Alleged Copyright, or the Claimed Infringement Lawsuit can therefore now be used to reopen the TDG Bankruptcy Case.

### B. There Is No Compelling Reason to Justify the Delay Between the Closing of the TDG Bankruptcy Case and the Filing of the Motion

55. The TDG Bankruptcy Case was closed on May 8, 2014. The Motion was filed on September 23, 2015, a delay of over sixteen months. The Fifth Circuit has stated, "[t]he longer the time between the closing of the estate and the motion to reopen … the more compelling the reason for reopening the case should be."[76] In that instance, the court was expressing concern about a seven month gap between closing and the motion to reopen.[77] In

---

[73] *Id. (citing Kozman v. Herzig (In re Herzig),* 96 B.R. 264, 266 (9th Cir. B.A.P 1989)).

[74] *Price v. Haker (In re Haker),* 411 F.2d 568, 569 (5th Cir. 1969) ("*Haker*").

[75] *Id*; *Walker,* 323 B.R. at 194.

[76] *Case*, 937 F.2d at 1018.

[77] *Id*.

*Walker*, this Court, citing *Case*, found the debtor's failure to provide any compelling reason to justify the eight month delay between case closure and the motion to reopen as another basis, in addition to the doctrine of judicial estoppel, to deny the requested relief.[78]

56.     TDG has proffered no reason of any kind, much less a "compelling" one, for the delay of more than sixteen months, a much longer time period than the ones at issue in *Case* and *Walker*. Given the absence of any justification for reopening the case, the Motion must be denied.

    C.    The Alleged Copyright and the Claimed Infringement Lawsuit Lack Sufficient Probability, Administrability, and Substance to Warrant Reopening the Case

57.     The Alleged Copyright and the Claimed Infringement Lawsuit have no value which could benefit TDG's bankruptcy estate or its creditors, and therefore are not assets of such "probability, administrability and substance" to warrant the reopening of the TDG Bankruptcy Case. As noted above, in October 2010 TDG brought a claim against New Line based on his assertion that *The Conjuring* movie was based on his Conjuring Treatment. While New Line had already purchased the Conjuring Treatment through the OQA, to protect itself it entered into an Amendment to the OQA under which TDG and the TDG Companies expressly granted the Conjuring Treatment to New Line and released any claims against New Line. Subsequently, in connection with the JAMS Arbitration, the Arbitrator issued a Final Award and found that TDG "retained no rights whatsoever in 'The Conjuring' project" including The Conjuring Treatment.[79] TDG has failed to put forward any evidence whatsoever to substantiate

---

[78]    *Walker*, 323 B.R. at 194.

[79]    O'Connor Decl. Ex. L, p. 31. In the event that any portion of the Claimed Infringement Lawsuit survives the eventual *res judicata* effect of the JAMS Final Award, it will be subject to arbitration before JAMS pursuant to the arbitration provisions in the parties' Agreements, which United States District Judge the Honorable Lee H. Rosenthal has already held are valid and binding on the parties. *Id.* Ex. O, p. 24.

the likelihood that the Alleged Copyright will be granted or that he will succeed in the Claimed Infringement Lawsuit.

58. The Fifth Circuit addressed a similar situation in *Haker*. There, the debtor-appellant, similar to TDG here, was seeking to reopen his bankruptcy case in the hope that the bankruptcy trustee would take up a Texas state-court action which had already been decided against the debtor. The Fifth Circuit upheld the denial of the petition to reopen, finding that the likelihood of recovery was "too remote," and appellant was in essence "seeking a second bite of the cherry."[80]

59. *Haker* clearly mandates the denial of the Motion. As determined in the JAMS Arbitration, the Conjuring Treatment was sold by TDG to New Line and TDG does not retain any interest in such asset. Based upon the determination of the Arbitrator in the JAMS Arbitration, the likelihood of a bankruptcy trustee succeeding on the Alleged Copyright and Claimed Infringement Lawsuit is too remote to warrant the reopening of the TDG Bankruptcy Case.[81]

**WHEREFORE**, New Line requests the entry of an order (i) denying TDG's Motion to reopen his closed bankruptcy case and (ii) granting such other and further relief as the Court deems just and proper.

---

[80] *Haker*, 411 F.2d at 569.

[81] *Id*.

Dated: Houston, Texas
October 14, 2015

          Respectfully Submitted,

          JACKSON WALKER L.L.P.

          */s/ Charles L. Chip Babcock*
          Charles L. "Chip" Babcock
          State Bar No. 01479500
          S.D. ID # 10982
          *Attorney-in-Charge*
          cbabcock@jw.com
          1401 McKinney, Suite 1900
          Houston, Texas 77010
          (713) 752-4200
          (713) 752-4221 – Fax

          **ATTORNEYS FOR NEW LINE PRODUCTIONS, INC.**

**OF COUNSEL:**
JACKSON WALKER L.L.P.

Bruce J. Ruzinsky
State Bar No. 17469425
S.D. ID # 5037
bruzinsky@jw.com
Matthew D. Cavenaugh
State Bar No. 24062656
S.D. ID # 1134544
mcavenaugh@jw.com
1401 McKinney, Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 752-4221 – Fax