

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
01/22/2016

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Tony DeRosa-Grund** | § | **Case No. 09-33264** |
| **aka Pro Jo Poker** | § | |
| | § | **Chapter 7** |
| **Debtor.** | § | |

### MEMORANDUM OPINION ON THE DEBTOR'S MOTION TO REOPEN CHAPTER 7 CASE PURSUANT TO 11 U.S.C. § 350
[Doc. No. 92]

#### I. INTRODUCTION

At bar is a dispute between Hollywood insiders and a Texas outsider concerning certain rights involving a blockbuster movie from 2013 entitled "The Conjuring." In the 1982 movie entitled "The Verdict," Paul Newman, who had the starring role as a solo practitioner suing a hospital for medical malpractice, delivers a brief closing to the jury which includes the following line: "We become tired of hearing people lie." This Court feels the same way about the debtor here.

The resolution of the dispute at bar requires a walk down memory lane. On May 7, 2009, (the "Petition Date"), an involuntary Chapter 7 bankruptcy petition was filed against Tony DeRosa-Grund aka Pro Jo Poker (the "Debtor"), [Doc. No. 1], and on June 8, 2009, this Court entered an order for relief. [Doc. No. 11]. The Debtor received a discharge on July 26, 2010, [Doc. No. 54]; the case was administered, and pro rata distributions were made to creditors, [Doc. No. 88]; and on May 8, 2014, this Court signed a final degree closing this case. [Doc. No. 90]. As of that date, it appeared that this case was over.

However, a second act began on September 23, 2015, when the Debtor, pursuant to 11 U.S.C. § 350(b),[1] filed a motion to reopen his Chapter 7 case (the "<u>Motion to Reopen</u>").   Two objections were lodged to the Motion to Reopen. The first was filed by PSG Poker, LLC ("<u>PSG</u>") and Phil Gordon ("<u>Gordon</u>") on October 14, 2015, [Doc. No. 93], but was later withdrawn on November 25, 2015, [Doc. No. 97].  A second objection was also filed on October 14, 2015 by New Line Productions, Inc. ("<u>New Line</u>"), a subsidiary and affiliate of Warner Brothers Entertainment ("<u>Warner Brothers</u>"), [Doc. No. 94].  Since the filing of its objection, New Line, unlike PSG and Gordon, has vigorously prosecuted its objection.

This Court held a multi-day hearing on the Motion to Reopen on December 1, 2015, December 2, 2015, December 3, 2015, and December 7, 2015, on which date the parties delivered closing arguments and the Court took the matter under advisement (hereinafter, the multi-day hearing is referred to the "<u>Hearing</u>").  During the Hearing, the Debtor presented his case-in-chief by calling one witness—himself—and by introducing six exhibits.  New Line presented its case-in-chief by calling two witnesses—the Debtor and Michael J. O'Connor ("<u>O'Connor</u>")—and by introducing fifteen exhibits.[2]

The Debtor contends that his case should be reopened on the basis that he failed to list a particular asset on his original schedules that he now believes should have been scheduled. Specifically, the Debtor, who is a movie and television producer and writer, asserts that he should have scheduled an asset that, in the movie business, is known as a "treatment."  A "treatment" is an "abridged script; longer than a synopsis.  It consists of a summary of each

---

[1] Hereinafter, any reference to a section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.  Further, any reference to "the Code" refers to the United States Bankruptcy Code.  Finally, any reference to a Rule refers to the Federal Rules of Bankruptcy Procedure.

[2] With respect to three of these exhibits—Exhibits No. 8, 9, and 10—the Court admitted less than all of the pages. The twelve exhibits that this Court admitted in their entirety are: Exhibits No. 1, 2, 4, 5, 6, 7, 13, 15, 16, 20, 21 and 22.

major scene of a proposed movie, and may even include snippets of dialogue."[3]  Here, the
Debtor contends that he should have scheduled the "treatment" for what subsequently became
the screenplay for "The Conjuring" (hereinafter this particular treatment will be referred to as the
"Treatment," and the movie itself will be referred to as "The Conjuring").  The Debtor now
wants this Court to reopen his case so that: (1)  he can amend his schedules to include the
Treatment, for which he believes has value; (2) the Chapter 7 trustee can then investigate and
determine the value of the Treatment; (3) the trustee can then sell or otherwise dispose of the
Treatment in order to bring in needed cash to the estate; and (4) the trustee can then distribute
these proceeds to pay off the two remaining allowed claims in this case, which total
approximately $185,000.00.[4]  Left unsaid by the Debtor is his hope—indeed, his strong belief—
that the Treatment is so valuable that the trustee, after administering this asset, will generate so
much cash for the estate that after payment of the two remaining claims, as well as the Trustee's
fee, there will be a substantial amount of cash remaining to be distributed to the Debtor himself.
*See e.g.* 11 U.S.C. § 726(a)(6); *In re Solomon*, 129 F.3d 608, n.10 (5th Cir. 1997)(under the
statutory distribution of property of the Chapter 7 estate, once all the claims are paid in full, the
debtor generally receives the remaining proceeds).

New Line, which is in the movie-making business and is an affiliate of Warner Brothers,
strongly opposes reopening the Debtor's case.  It asserts that the only reason that the Debtor now

---

[3] Film Glossary, Glossary, Student Resources, N.Y. FILM ACAD.  (last visited Dec. 9, 2015, 3:18 PM),
https://www.nyfa.edu/student-resources/glossary/#T.  The Writers Guild of America, West considers a "treatment"
one example of  "Literary Material."  WRITERS GUILD OF AMERICA, WEST & WRITERS GUILD OF AMERICA, EAST,
SCREEN      CREDITS      MANUAL,      16      (2010),      https://www.wgaeast.org/wp-
content/uploads/typo3/user_upload/files/Screen_Credits_Manual_2010.pdf.

[4] In the trustee's final account and distribution report filed on March 26, 2014, [Doc. No. 88], four general
unsecured creditors held allowed claims that remained unpaid. Two of those creditors, Gordon and PSG, settled with
the Debtor on the eve of the Hearing, and their claims have been satisfied in full.  [Doc. No. 97].  Stated differently,
the Debtor paid off these creditors to ensure that they would not prosecute their objection to the Motion to Reopen.
The two remaining creditors on the trustee's final account and distribution report, Matt Maranz and the Internal
Revenue Service, have remaining allowed claims of $171,426.84 and $13,473.91, respectively.  [Doc. No. 88];
[Debtor's Ex. No. 4, pp.4–5 of 12].

seeks to reopen his case is because an arbitrator recently ruled against the Debtor in his dispute with New Line over the extent of any rights that he has to revenues generated by "The Conjuring" and any sequels to be made to this movie. New Line asserts that: (1) it acquired the Treatment several years ago from one of the Debtor's wholly-owned entities; (2) the Debtor himself has never owned the Treatment; (3) the Debtor has fabricated the story that he personally owned the Treatment on the Petition Date; and (4) the Debtor, angry that New Line has been unwilling to pay him a dime to settle the various lawsuits that he and his privately-held entities have brought against New Line, is now attempting to bring in the Chapter 7 trustee to do his bidding for him. Essentially, New Line's argument is that the Debtor believes that there is strength in numbers, and by having to fend off not only the Debtor, but also the trustee, New Line will cave in and pay good money to the trustee for the rights to the Treatment, much of which will wind up in the Debtor's pockets after payment of the two remaining claims and the Trustee's fees. Under these circumstances, New Line contends that the Debtor is gaming the bankruptcy system and therefore that this Court should not reopen his case.

Alternatively, New Line argues that even if this Court concludes that the Debtor, as opposed to one of his companies, owned the Treatment on the Petition Date—and that therefore the case should be reopened so that the Debtor can schedule the Treatment—the Debtor should be judicially estopped from receiving any benefits from the Trustee's eventual disposition of the Treatment because the Debtor's initial failure to disclose the Treatment was not inadvertent. *See e.g.*, *In Re Jackson*, 2012 WL 3071218, *aff'd* per curiam by the Fifth Circuit on direct appeal at *In Re Jackson*, 574 F. App'x 317 (5th Cir. 2014) (Where debtor's failure to disclose his interest in a patent was not inadvertent, the court, although allowing the debtor to schedule the patent, nevertheless held that the debtor was estopped from receiving any funds remaining after the

trustee administered the patent and paid claims in full, with any excess funds to either escheat to the United States or be made available to public interest, charitable, educational, and other public service organizations).

This Court now issues findings of fact and conclusions of law pursuant to Rules 9014 and 7052. To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves the right to make additional findings and conclusions as it deems appropriate, or as the parties may request. For the reasons set forth herein, this Court will grant the Motion to Reopen; however, because the Court finds that the Debtor's failure to schedule the Treatment was not inadvertent, the Debtor will be estopped from receiving any proceeds from the Trustee's administration of the Treatment.

## II. FINDINGS OF FACT

The relevant facts—as established by the pleadings, the admitted exhibits, the testimony of the witnesses, the stipulations and admissions of the parties, and the judicial notice that this Court takes of four complaints filed by the Debtor in the United States District Court for the Southern District of Texas—are as follows:

### A. Entities Owned and Controlled by the Debtor

1. The Debtor owns, or has owned, various entities, all of which have been corporations except one entity that was initially a dba (but became a LLC). The Debtor formed these entities to help him in his career as a movie producer and writer. For example, the Debtor testified that he used one entity "for marketing purposes." [Hr'g Tr. 104:5–6, Dec. 1, 2015].[5]

---

[5] Any reference to a hearing transcript is a reference to the transcript of the Hearing.

2. One of the entities owned by the Debtor is named Silverbird Media Group, LLC ("Silverbird").

3. A second entity owned by the Debtor is named Evergreen Media Group, LLC ("Evergreen"). Originally, this entity was a dba known as Evergreen Media Group (the "DBA").

4. A third entity owned by the Debtor is Gallows Hill Pictures, LLC ("Gallows Hill").

**B. Entity Owned by the Debtor's Family Trust**

5. Aside from the above described entities which the Debtor has controlled, and still controls, there exists another entity named Evergreen Media Holdings, LLC ("Holdings"). [Hr'g Tr. 96:19–24, Dec. 1, 2015]. This entity, which was formed in 2009, is controlled by what the Debtor has referred to as the family-owned trust. [*Id*.]. The name of this trust is the DeRosa-Grund Family Trust (the "Family Trust"), and the trustee of the Family Trust is the Debtor's step-daughter. [Hr'g Tr. 98:7–9, Dec. 1, 2015]. It is unclear as to whether the Family Trust owns 100% of Holdings, or whether the Debtor also has a direct stock interest in Holdings. The Debtor is, however, an employee of Holdings. [Hr'g Tr. 83:3–4, Dec. 1, 2015]. Indeed, the Debtor is more than a mere "employee" of Holdings; he signed two key contracts (to be subsequently discussed herein) as the "Manager" of Holdings, [New Line Ex. Nos. 4 & 5], and as the "Executive Chairman" of Holdings, [New Line Ex. No. 7].

**C. Relevant Prepetition Events**

6. In the 1990s, the Debtor was introduced to Ed and Lorraine Warren (the "Warrens"). [Hr'g Tr. 40:16–25, Dec. 1, 2015]. The Debtor and the Warrens developed a friendship and discussed "lots and lots of cases that Ed thought could be movies or

television shows." [Hr'g Tr. 40:19–21, Dec. 1, 2015]. During one of their discussions, Ed Warren played a tape recording of an interview between himself and Carolyn Perron (the "Carolyn Perron Interview"). [Hr'g Tr. 41:2–3, Dec. 1, 2015]. Throughout this discussion, Ed Warren would "start and stop the tape and give [the Debtor] comments." (the "Ed Warren Commentary") [Hr'g Tr. 41:5–6, Dec. 1, 2015]. The Debtor taped this discussion with Ed Warren on a digital recorder. [Hr'g Tr. 41:6–7, Dec. 1, 2015]. This recording included the Carolyn Perron Interview, the Ed Warren Commentary, and also the Debtor's ideas of how to turn the Perrons' story (the "Perron Life Rights") and the Warrens' story (the "Warren Life Rights") into a movie. [Hr'g Tr. 41:6–7; 12–16, Dec. 1, 2015]. From his digital recording, the Debtor made the Treatment. [Hr'g Tr. 41:17–21, Dec. 1, 2015]. The Treatment is not only on a tape; it is also in a written format drafted by the Debtor. [Hr'g Tr. 41:19–22, Dec. 1, 2015].

7. Subsequently, sometime in the late '90s, Silverbird, one of the companies owned by the Debtor, acquired the Perron Life Rights, but the exact date of this acquisition is unclear from the record. The Debtor testified that Silverbird acquired the Perron Life Rights in "Maybe [the] late '90s." [Hr'g Tr. 48:13, Dec. 1, 2015]. Hence, Silverbird acquired the Perron Life Rights many years prior to the Petition Date (i.e. prior to May 7, 2009).

8. On February 9, 2009—three months before the Petition Date—the Debtor, in his capacity as the managing member of Silverbird, executed a document entitled "Assignment of Rights," for the benefit of another company that the Debtor owned— namely, Evergreen—[New Line Ex. No. 2]. By executing this document, the Debtor

7

intended for Silverbird to convey to Evergreen all of the "rights title and interest, inclusive of any and all ownership and options agreements to the Life Rights to the Perron Family and the feature film project currently entitled 'the Conjuring.' " [*Id.*]. The Debtor testified that when he executed the Assignment of Rights, he was shutting down Silverbird and that he was making this assignment to Evergreen for "housekeeping purposes." [Hr'g Tr. 103:9–11, Dec. 1, 2015]. However, on February 9, 2009, Evergreen was not yet in existence; it was actually formed three days later, on February 12, 2009. [Hr'g Tr. 101:12–13, Dec. 1, 2015]. The Debtor testified that he "wasn't aware that it didn't exist at the time." [Hr'g Tr. 103:6, Dec. 1, 2015].

9.  Sometime in 2009, after Silverbird executed the Assignment of Rights to Evergreen, Holdings—the company controlled by the Family Trust for which the Debtor is an officer—acquired both the Perron Life Rights and the Warren Life Rights. [Hr'g Tr. 48:14–24, Dec. 1, 2015]. The exact date of the acquisition by Holdings is not clear; the Debtor testified only that the acquisition was "somewhere in 2009." [Hr'g Tr. 48:24, Dec. 1, 2015].

10. In neither the Assignment of Rights (which expressly referenced the Perron Life Rights) nor the documents executed "somewhere in 2009," by which Holdings acquired both the Perron Life Rights and the Warren Life Rights, was the Treatment expressly referenced. [*See* New Line Ex. No. 2]; [Hr'g Tr. 48:14–49:4, Dec. 1, 2015].

**D. Background of the Debtor's Chapter 7 Case, Relevant Representations Made in His Schedules and Statement of Financial Affairs, and Other Actions Taken and Orders Entered Relating to the Debtor's Chapter 7 Case.**

> ### i. <u>General Background</u>

11. On May 7, 2009 (already defined as the "<u>Petition Date</u>"), an involuntary Chapter 7 bankruptcy petition was filed against Tony DeRosa-Grund, aka Pro Jo Poker (already defined as the "<u>Debtor</u>"). [Doc. No. 1]. The case was assigned to the Honorable Bankruptcy Judge Wesley W. Steen.[6]

12. On June 8, 2009, Bankruptcy Judge Steen entered an order for relief. [Doc. No. 11].

13. On June 15, 2009, David J. Askanase was appointed the Chapter 7 Trustee (the "<u>Trustee</u>").

14. The Debtor chose Nelson Hensley ("<u>Hensley</u>") to represent him in this Chapter 7 case. Hensley is a very experienced bankruptcy lawyer who has been practicing for over 30 years.

> ### ii. <u>Representations on Schedules and Statement of Financial Affairs</u>

15. On July 10, 2009, the Debtor filed his original Schedules and Statement of Financial Affairs (SOFA). [Doc. No. 19]. The Debtor reviewed his Schedules and SOFA with his attorney (i.e. Hensley) before he signed them. [Hr'g Tr. 84:2–**7**, Dec. 1, 2015]. At the Hearing, the Debtor testified that "to the best of [his] understanding [his Schedules and SOFA were] all honest and true at the time [he] signed [them]." [Hr'g Tr. 86:2–4, Dec. 1, 2015].

16. Item No. 13 on Schedule B required the disclosure of "Stock and interests in incorporated and unincorporated businesses." The Debtor represented that he had an

---

[6] On January 17, 2011, the Debtor's Chapter 7 case was randomly reassigned to the undersigned judge due to Judge Steen's retirement. [Doc. No. 56].

interest in Gallows Hill and that the value of this interest was $1.00. [Doc. No. 19. p. 5 of 31].

17. In the same column the Debtor represented that he had an interest in Evergreen and that the value of this interest was $1,000.00. [*Id.*].

18. The Debtor did not disclose his stock interest in Silverbird on his Schedule B.

19. Item No. 22 on Schedule B required the disclosure of "Patents, copyrights, and other intellectual property." The Debtor represented that he had an "Application Pending" and that the value of this application was $1.00. [Doc. No. 19. p. 6 of 31]. Although Schedule B required the Debtor to "Give Particulars" about any patent, copyright, or other intellectual property, the Debtor did not do so. At the Hearing, the Debtor made it clear that the "Application Pending" was not an application to copyright the Treatment, but rather was an application for a patent unrelated to "The Conjuring." [Hr'g Tr. 90:1–11; 91:11–92:9, Dec. 1, 2015].

20. The Debtor testified that he disclosed the patent application in Item No. 22 because he knew that the patent was registered. [Hr'g Tr. 87:5–9, Dec. 1, 2015].

21. The Debtor did not disclose the Treatment on his Schedule B. [See Debtor's Ex. No. 2]; [Hr'g Tr. 84:20–86:6, Dec. 1, 2015]. Stated differently, by not scheduling the Treatment, the Debtor represented to this Court and to his creditors that he, in his individual capacity, did not own the Treatment.

22. One reason that the Debtor did not disclose the Treatment was "[b]ecause I didn't have a registration on it, sir." [Hr'g Tr. 88:10–20, Dec. 1, 2015].

23. A second reason that the Debtor did not disclose the Treatment was because:

> I didn't think that there was anything to put down because (a) I didn't think it had any value, (b) New Line said they weren't using it. I

> couldn't use it without the Perron Family rights and the Warren rights. I couldn't use it without getting sued, and I didn't think it had any value. No one was using it. I wasn't thinking about a copyright registration for it.  I didn't think there was any reason to register it because I couldn't use it. New Line had it blocked.

[Hr'g Tr. 90:12–19, Dec. 1, 2015].

24. Item No. 18a of the SOFA required the Debtor to "list the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within **six years** immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within **six years** immediately preceding the commencement of this case."  The Debtor failed to make proper disclosure required by this Item Number 18a because he failed to list the required information of the following entities: Holdings, Silverbird, Evergreen, Gallows Hill, DBA, and Holdings.[7]  Rather, the Debtor's skeletal and misleading response to Item Number 18a was as follows: "Tony DeRosa-Grund, XXX-XX-9860, Magnolia Texas, Patent Development."  [Debtor's Ex. No. 2]; [Doc. No. 19].

---

[7] The record is unclear whether, and to what extent, the Debtor had any equity interest in Holdings.  However, he was a "manager" of this entity as evidenced by his signing the Option Quitclaim Agreement and Producer Loanout Agreement in that capacity, [*See* New Line Ex. Nos. 4 & 5].  Thus, the Debtor needed to disclose Holdings by virtue of his position as its "manager."   Moreover, there is no question that the Debtor, on the Petition Date, had a substantial, if not 100%, ownership interest in Silverbird and Evergreen, and that he was an executive of these entities.  Indeed, New Line's Exhibit No. 4 (the Option Quitclaim Agreement) reflects that he was a member of Silverbird and a manager of Evergreen at the time he executed this contract, [New Line Ex. No. 4]; and New Line's Exhibit No. 7 (amendment to the Option Quitclaim Agreement) reflects that he was a director of both Silverbird and Evergreen when executing this particular contract, [New Line Ex. No. 7].  Therefore, in responding to Item No. 18a, the Debtor should have disclosed the information requested about Silverbird and Evergreen.

### iii. <u>Pleadings and Orders Entered Regarding Nondischargeability of One Particular Debt and a General Discharge for the Debtor (Except for the One Nondischargeable Debt)</u>

25. On February 15, 2010, PSG and Gordon filed a complaint against the Debtor under § 523(a) seeking to prevent the discharge of a certain judgment that the United States District Court for the Southern District of New York had entered against the Debtor on September 24, 2008.  [Adv. Proc. No. 10-03068, Adv. Doc. No. 1-2].  This judgment was for $340,000.00 in compensatory damages, $200,000.00 in punitive damages, and $36,266.70 in attorneys' fees, for a total amount of $576,266.70. (the "<u>$576,266.70 New York Judgment</u>") [Adv. Proc. No. 10-03068, Doc. Nos. 1–1 & 1–4].  The $576,266.70 New York Judgment arose due to the Debtor's fraudulent conduct relating to a television program involving professional poker players competing against amateurs.  [Adv. Proc. No. 10-03068, Adv. Doc. No. 12–2].

26. On June 23, 2010, Bankruptcy Judge Steen entered an order declaring that the $576,266.70 New York Judgment was a non-dischargeable debt.  [Adv. Proc. No. 10-03068, Doc. No. 14].

27. On July 26, 2010, Bankruptcy Judge Steen granted the Debtor a discharge pursuant to § 727 of the Code.  [Doc. No. 54].  The order entered on the docket granted the Debtor a discharge of all of his debts except the $576,266.70 New York Judgment. [*Id.*].

### iv. <u>The Trustee's Final Accounting and This Court's Closure of the Case</u>

28. On March 26, 2014, the Trustee submitted his final account and distribution report certifying that the Debtor's Chapter 7 estate (the "<u>Estate</u>") had been fully administered.  [Doc. No. 88]; [Debtor's Ex. No 4].  The Estate yielded net receipts of

$100,013.67.  [Doc. No. 88];[Debtor's Ex. No. 4].  Of this amount, $48,952.08 was distributed to pay allowed claims, and the remaining $49,128.59 was used to pay administrative expenses. [*Id*. at p. 1 of 12]. The aggregate amount of debts discharged without payment totaled $1,121,996.43. [*Id*. at p. 1 of 12].  On May 8, 2014, the Debtor's Chapter 7 case was closed.  [Doc. No. 90].

**E.  Transactions Occurring During the Debtor's Chapter 7 Case**

    **i.  <u>Transactions involving New Line, the Debtor, Silverbird, Evergreen, and Holdings</u>**

29. On November 11, 2009, New Line (on the one hand) and Holdings, the Debtor, Silverbird, and Evergreen (on the other) executed an Option Quitclaim Agreement (the "<u>Option Quitclaim Agreement</u>").  [New Line Ex. No. 4].  This agreement, subject to certain conditions precedent, granted New Line a right to acquire all of the Debtor, Holdings, Evergreen, and Silverbird's right, title, and interest, except for certain reserved rights, in and to certain assets, including:

    a.  "Any and all literary material in connection with the project currently known as 'the Conjuring' fka 'The Untitled Hayes Brothers Project'[8]. . . "  [*Id*. at p.2 of 38, ¶1A(a)];

    b.  "The entire case file library. . . related to the Warren's paranormal investigations. . . including but not limited to all interviews, case histories, photographs, notes, timelines. . . " [*Id*., p. 3 of 38, ¶1A(a)(iii)];

---

[8] The Hayes brothers are independent writers whom New Line (or New Line's affiliate, Warner Brothers) hired to write the screenplay for "The Conjuring."  [Hr'g Tr. 57:17–19, Dec. 1, 2015].  In certain documents introduced into the record at the Hearing, references were occasionally made to the "Hayes Brothers Project."  [Hr'g Tr. 22:9–12, Dec. 1, 2015].  This phrase is nothing more than a reference to the putative screenplay for "The Conjuring."

c.  "Any and all right, title and interest in and to the entire life stories of Ed and Lorraine Warren and the Perrons. . . including without limitation, all paranormal investigations of the Warrens and the paranormal experiences of the Perrons," [*Id.* at ¶1A(b)]; and

d.  "Any and all agreements, assignments, instruments and other documents heretofore made pursuant to which services are to be rented, and/or material furnished in connection with any and all motion pictures or other productions to be based in whole or in part on the Literary Material. . . or which transfer rights in and to the Literary Material. . ." [*Id.* at ¶1A(c)];

e.  "Any and all rights and interests of every type and nature heretofore or hereafter acquired by [the Debtor, Holdings, Evergreen or Silverbird] with respect to the Property[9] and/or pursuant to the Agreements, including without limitation, all motion picture and other rights to the life stories of the Warrens, the life stories of the Perrons and the characters of Ed and Lorraine Warren." [*Id.* at p. 5 of 38, ¶1A(d)].

f.  The Option Quitclaim Agreement was subsequently amended on October 19, 2010.  [*See* Finding of Fact No. 41].

30. Also on November 11, 2009, New Line and Holdings, the Debtor, Silverbird, and Evergreen executed a Producer Loanout Agreement (the "<u>Producer Loanout</u>

---

[9] The term "Property" is defined as "any and all literary material (collectively, the 'Literary Material') in connection with the project currently known as 'THE CONJURING' fka 'THE UNTITLED HAYES BROTHERS PROJECT' fka 'THREE KNOCKS ON THE DOOR: THE LIVES AND CAREER OF ED AND LORRAINE WARREN' fka 'THE DEMONOLOGISTS,' including without limitations… any and all drafts, revisions, and rewrites of that certain screenplay…and related material written by Harrison Smith, Jr.…of that certain screenplay… and any related material written by Chad Hayes and Carey Hayes… entire case file library… any and all right, title, and interest in and to the entire life stories… any and all agreements, assignments, instruments and other documents heretofore made pursuant to which services are to be rendered, and/or materials furnished…" [New Line Ex. No. 4, p. 2-3 or 38].

Agreement"). [New Line Ex. No. 5]. The Producer Loanout Agreement is an agreement "by which Mr. DeRosa-Grund serves [sic] as a producer were provided by his loanout company. . . And that's a provision that provides that all the results and proceeds of anything that Mr. DeRosa-Grund did either before or after the agreement are deemed the property of New Line including ideas, suggestions, themes, plots, stories, characterizations, dialogue, etc." [Hr'g Tr. 173:10–24, Dec. 1, 2015].

31. Additionally, on November 11, 2009, the Debtor, Holdings, and New Line entered into an agreement entitled Certificate of Employment (the "COE"). The essential terms of the COE are that the Debtor agrees for "good and valuable consideration" to render services in connection with "The Conjuring" including "all ideas, suggestions, themes, plots, stories, characterizations, dialogues, titles and other materials, whether in writing or not in writing at any time heretofore or hereafter created or contributed… copyrights, neighboring rights, trademarks and any and all other ownership." [New Line Ex. No. 22].

32. The Trustee was *not* a party to, nor did he sign, the Option Quitclaim Agreement, the amendment to the Option Quitclaim Agreement, the Producer Loanout Agreement, or the COE. [*See* New Line Ex. Nos. 4, 5, 7 & 22].

33. Because the Trustee was not a party to, and did not execute, the Option Quitclaim Agreement, the Amendment to the Option Quitclaim Agreement, the Producer Loanout Agreement, or the COE, no property of the Estate was transferred by virtue of the execution of these documents.

ii. <u>**Transactions Involving the Trustee, New Line, Holdings, the Debtor and Peter Safran**</u>[10]

34. On December 22, 2009, the Trustee filed a Motion to Approve Agreement Between Trustee and Evergreen Media Holdings, LLC, New Line Productions, Inc., Peter Safran, and Tony DeRosa-Grund (the "<u>Trustee's Motion</u>"). [Doc. No. 33].

    a.  In the Trustee's Motion, he asserted that he lacked sufficient information to evaluate whether the Estate had an interest in the proceeds to be generated from the movie to be made called "The Conjuring," although he noted that the Debtor maintained "that because Debtor's family trust purportedly owns Evergreen Media Holdings and because the deal was entered into post-petition, the Estate lacks any interest in the rights related to the movie." [Doc. No. 33, ¶ 4].

    b.  Further, the Trustee represented that he was not in a "position to evaluate the factual allegations that Debtor and [Holdings]. . . made  regarding the ownership of the intellectual property and any other thing of value to be transferred to New Line," [Doc. No. 33, ¶ 5], and that the Debtor and Holdings represented to the Trustee that if the "Trustee fails to accept the proposal deal and release New Line of any claim  that the Estate will forfeit that collection of $100,000.00. . . [and] there will not be a second opportunity to receive payment for a similar motion picture deal."  [*Id.*]

    c.  According to the Trustee, he was faced with a "difficult choice:" if he were to conduct an "adequate investigation. . . of the facts surrounding Evergreen Media Holdings' acquisition of the motion picture rights, he risks the

---

[10] Peter Safran was one of the producers of "The Conjuring."

threatened loss of $100,000.00 for the estate (which, according to the Debtor, currently does not have a penny)." [*Id.*].

d. The Trustee's Motion requested that the Court "authorize him to release New Line from any claim arising out of any of the intellectual property or other rights to be assigned or otherwise transferred to New Line in exchange for the payment of $100,000.00. . ." [Doc. No. 33]; [New Line Ex. No. 19].

35. No creditor or party-in-interest (including the Debtor) ever objected to the allegations set forth in the Trustee's Motion, nor did anyone object to the relief sought therein.

36. On January 27, 2010, Bankruptcy Judge Steen entered an order approving the Trustee's Motion (the "Order Approving Agreement"). [Doc. No. 38]. The Order Approving Agreement authorized the Trustee, in exchange for a $100,000.00 payment made by New Line to him for the benefit of the Estate, to release any claims for injunctive relief that the Estate had or may have against New Line, its affiliates, or any entities involved in the "exploitation, marketing, distribution or production of the material described in the Deal Memo. . .  arising out of the execution of and performance under any of the agreements contemplated by the Deal Memo." [*Id.* at ¶ 1]. Additionally, the Order Approving Agreement authorized the Trustee to accept the $100,000.00 payment from New Line in "full satisfaction and release of any claims for injunctive relief that the Estate has, had or may come to have against New Line arising out of or relating to the transfer of intellectual property and any other rights associated therewith or related thereto contemplated by the Deal Memo." [*Id.* at ¶ 2]. Finally, the Order Approving Agreement recognized that in authorizing the Trustee to release any Estate claims, the release related to agreements concerning the

17

"Untitled Hayes Brothers Project"—otherwise known as "the Picture." [Debtor's Ex. No. 3].[11]

37. After the Order Approving Agreement was signed and entered on the docket, the Trustee and New Line consummated the agreement, and New Line paid $100,000.00 to the Trustee—funds that were eventually distributed to pay allowed claims. [*See* Finding of Fact No. 28].

**F. Dispute Breaks Out Over Whether New Line Has Misappropriated the Treatment**

38. At some point after Judge Steen signed the Order Approving Agreement on January 27, 2010, a dispute broke out between the Debtor and New Line over whether New Line was misappropriating the Treatment in order to have its own writers work up the screenplay for the "The Conjuring." [*See* New Line Ex. No. 6]; [Debtor's Ex. No. 6].

39. Negotiations ensued over this dispute, but no agreement was reached.

40. On October 7, 2010, at 5:49 P.M., the Debtor, sent an e-mail to Craig Alexander ("Alexander"), the senior vice president and head of business and legal affairs of New Line, inquiring as to whether they could confer the following day regarding "John's proposed compromise." [Debtor's Ex. No. 6]. This e-mail concerned a proposed compromise about the Debtor's belief that the Hayes brothers and New Line were stealing the Treatment and using it to write the screenplay for "The Conjuring."[12]

---

[11] Attached to the Order Approving Agreement was a so-called "Deal Memo" dated December 4, 2009. This document was signed by Holdings, the Debtor, New Line and Peter Safran. The Trustee did not execute this document, and this is understandable because the "Deal Memo" added terms to the Option Quitclaim Agreement and the Producer Loanout Agreement (to which the Trustee was also not a party). The Deal Memo was attached to the Order Approving Agreement in order to document why New Line was paying $100,000.00 to the Trustee (i.e. to ensure that the Trustee would not seek an injunction against New Line for any rights that New Line was acquiring under the Option Quitclaim Agreement and the Producer Loanout Agreement, and any other agreements referenced in the Deal Memo).

[12] As set forth in fn. 8, the Hayes brothers are independent writers whom New Line (or New Line's affiliate, Warner Brothers) employed to write the script/screenplay for "The Conjuring." [Hr'g Tr. 57:17–19, Dec. 1, 2015].

[Debtor's Ex. No. 6].  On October 7, 2010, at 7:51 P.M., Alexander responded to the Debtor's e-mail by sending an e-mail back to him stating that: "I am afraid, I [i.e. New Line] can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to introduce that into the credit determination."[13]  [*Id.*] On October 7, 2010, at 8:44 P.M., the Debtor replied to Alexander's e-mail by stating the following: "Bullshit Craig, at least 60%-65% of the story if not more, is from *my* Treatment."  [New Line Ex. No. 6](*emphasis added*).  The Debtor then made the following threat:

> I shut my mouth up till now to get this [movie] made, but no more.  All bets are off.  I had the conversation with Peter Safran [one of the producers] a while back and also with John, even before there were any "issues" that this script was based on *my story/treatment* and transited way beyond any producer duties, so shouldn't I be credited/paid for that work.  No more Mr. Nice guy, no more patience. *No one rips me off creatively or otherwise. So I'll just sue everyone here because I have had enough of being defrauded and now screwed with.  See you in court.*

> [New Line Ex. No. 6](*emphasis added*).

41. On October 19, 2010, the Option Quitclaim Agreement was later amended to add an additional paragraph that read, in relevant part, "[i]f DeRosa-Grund contributed any oral or written material to the screenplay for the motion picture currently entitled 'The Conjuring' (including but not limited to, a treatment), such material is owned and controlled by [the Debtor, Evergreen, Silverbird, and Holdings] pursuant to the terms of the Certificate of Employment dated as of November 11, 2009 between New Line and Holdings for the services of DeRosa-Grund. . ."  [New Line Ex. No. 7, p. 9 of 11].  [Hr'g Tr. 171:24–172:13, Dec. 1, 2015].

---

[13] The phrase "credit determination" refers to whether someone who has written a screenplay for a movie should be given credit at the end of the movie for writing the screenplay.

**G. "The Conjuring" is Released and Becomes a Huge Success**

42. On July 19, 2013, "The Conjuring" was released and became one of the highest grossing films of that year.  [Hr'g Tr. 6:17–18, Dec. 1, 2015]; [Debtor's Ex. No. 5, p. 2] (District Judge Lee Rosenthal's Memorandum Opinion finding that the movie "grossed over $300 million worldwide.").

43. After the release of "The Conjuring" began generating substantial revenues, the Debtor continued to insist that New Line and Warner Brothers had misappropriated the Treatment and used it to write the screenplay for "The Conjuring."  [Debtor's Ex. No. 6]; [New Line Ex. No. 6].  New Line and Warner Brothers both denied this accusation.

**H. After the Debtor's Chapter 7 Case was Fully Administered, the Debtor Initiated Lawsuits Seeking to Recover Damages for, Among Other Actions, the Alleged Misappropriation by New Line of the Treatment.**

44. On March 28, 2014—two days after the Trustee filed his final account and distribution report, [Doc. No. 88]—the Debtor and Holdings filed suit against New Line and Warner Brothers in the United States District Court for the Southern District of Texas (the "District Court") alleging (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud in the inducement; (4) promissory estoppel; (5) conversion; (6) declaratory judgment; and (7) violation of the Lanham Act.  [Civil Action No. 14-00793, Doc. No. 1].[14]

---

[14] The Court was made aware of Civil Action No. 14-00793 and Civil Action No. 14-01117 because Debtor's Exhibit No. 5 is a Memorandum and Opinion issued by the District Court presiding over those lawsuits.  Further, counsel for the Debtor made this Court award of another suit pending in the District Court bearing Civil Action Number 15-02763.  [Hr'g Tr. 14:17–15:6, Dec. 1, 2015].  The Court has reviewed the docket sheet of these suits, as well as the docket sheet of one other suit filed by the Debtor against New Line in the District Court.  The Court has also reviewed the complaints filed by the Debtor to initiate these suits.  In this Court's Findings of Fact Nos. 44, 45, 46, 52, & 53, this Court cites to various allegations about the Treatment that the Debtor made in these complaints.  The Court is allowed to do so because "[c]ourt documents from another case may be used to show that the document was filed, that [a] party took a certain position, and that certain. . . allegations or admissions were made. . ."  *In re*

**a.** The civil action was assigned to the Honorable United States District Judge Lee H. Rosenthal.

**b.** Sanford L. Dow ("Dow"), a partner at the Houston law firm of Dow Golub Remels & Beverly, LLP), represented the Debtor in the civil action.  [*Id*.].

**c.** In this lawsuit, the Debtor made the following allegations with respect to the Treatment: (1) the Debtor's "strategy and vision…developed into and became the basis for the written story and treatment based on the 'Perron Farmhouse' Case File, all of which was used as the foundation and basis of the hit theatrical motion picture 'The Conjuring;' " (2) the Debtor "created, conceived, and authored the story and treatment of the 'Perron Farmhouse' Case File;" (3) the Debtor "created the 'The Conjuring' trademark;" (4) the Debtor sought to sell the aforementioned story and treatment, as well as the Warrens' life rights and Case Files, in conjunction with a feature motion picture series using 'The Conjuring' trademark that he had created;" (5) the Debtor "prior to entering into an agreement" with New Line worked with the Hayes brothers to turn the story and treatment into a " 'pitch' and, finally, a formal script;"  (6) the Hayes brothers "received copies of the [Debtor's] story, treatment, and recording," and  (7) New Line knew the Hayes brothers used the Debtor's "original story and treatment" as the "underlying foundation and basis" for their work.  [*Id*. at 5–6].

---

*FedEx Ground Package Sys.*, 2010 U.S. Dist, LEXIS 30303, at *10 (N.D. Ind. Mar. 29, 2010) (citation omitted); *see also Anderson v. Dallas Cty.*, No. 3:05-CV-1248-G, 2007 WL 1148994, at *3 (N.D. Tex. Apr. 18, 2007) *aff'd*, 286 F. App'x 850 (5th Cir. 2008) ("The Fifth Circuit has determined that a court may take judicial notice of a document filed in another court. . . to establish the fact of such litigation and related filings, but cannot take notice of the factual findings of another court.") (quoting *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998) ) (internal quotations omitted).

    **d.**   The Debtor requested, among other relief, that New Line and Warner Brothers pay damages for their alleged improper use of the Treatment.  [*Id*. at 29–30].

    **e.**   The Debtor did not notify the Trustee of this suit.

    **f.**   The Debtor did not amend his Schedule B to disclose the Treatment.[15]

    **g.**   The Debtor did not amend his Schedule B to disclose that he had filed a suit based, at least in part, on events that occurred prior to the Petition Date (i.e. the Debtor's writing of the Treatment).[16]

    **h.**   The Debtor's case was still open on the date of the Debtor's filing of this suit; therefore, the Debtor could have amended his Schedule B without having to reopen his case.

45. On April 23, 2014—less than one month after the Trustee filed his final account and distribution report—the Debtor, Holdings and Gerald D. Brittle[17] filed suit against Lorraine Warren, Tony Spera, Graymalkin Media, LLC, New Line, and Warner Brothers in the District Court alleging copyright infringement. [Civil Action No. 14-01117, Doc. No. 1].

---

[15] There is no question that Holdings, in addition to the Debtor, was the other plaintiff in this suit and that the prayer paragraph of the complaint reflects that they jointly sought the relief requested.  But, this fact did not relieve the Debtor from his duty as the debtor in his Chapter 7 case from amending his Schedule B to disclose that he had filed suit (i.e. owned an asset) seeking damages based upon events that occurred, at least in part, prior to the Petition Date (i.e. his writing the Treatment).  *See In re Robert's Plumbing & Heating, LLC*, No. 10-23221, 2011 WL 2972092, at *11 (Bankr. D. Md. July 20, 2011) ("For purposes of the Schedules, which are intended to relate to facts or events occurring before the filing of the Petition, the Debtor disclosed all facts or events through and including [the petition date]."); *see also, In re Castillo*, 508 B.R. 1, 7-8 (Bankr. W.D. Tex. 2014) ("debtors have an express, affirmative duty to disclose all assets even if there is uncertainty about if those assets are property of the estate"); *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013) ("Applying judicial estoppel under these circumstances recognizes the importance of the bankruptcy debtor's *affirmative and ongoing duty* to disclose assets, including unliquidated litigation interests.") (*emphasis added*).

[16] *See* fn. 15.

[17] Gerald D. Brittle is the author of "The Demonologist," a book about the lives and experience of Ed and Lorraine Warren.  [Civil Action No. 14-01117, Doc. No. 1, p. 12 of 33].

    **a.** This suit was initially assigned to the Honorable United States District Judge David Hittner.

    **b.** The Debtor, again represented by Sanford Dow, sought actual and punitive damages. [*Id.*].

    **c.** In this particular lawsuit, the Debtor asserted the following in regard to the Treatment: (1) the Debtor's "strategy and vision…developed into and became the basis for" the treatment based on Perron Family Case file;  (2) the Debtor's "strategy, vision, story and treatment" was used as the "foundation and basis" for "The Conjuring;" (3) New Line and Warner Brothers received copies of the Debtor's story, treatment, recording, "as well as any and all notes and materials he possessed related to the 'Perron Farmhouse' Case file;" and  (4) New Line and Warner Brothers were "acutely and actually aware that" the Debtor's story and treatment were the "underlying foundation and basis for the screenwriters work." [*Id.* at 4–6].

    **d.** The Debtor again requested, among other relief, that New Line, Warner Brothers, and other defendants, pay damages for their alleged improper use of the Treatment. [*Id.* at 30–32].

    **e.** The Debtor did not notify the Trustee of this suit.

    **f.** The Debtor did not amend his Schedule B to disclose the Treatment.[18]

    **g.** The Debtor did not amend his Schedule B to disclose that he had filed a suit based, at least in part, on events that occurred prior to the Petition Date (i.e. the Debtor's writing of the Treatment).[19]

---

[18] *See* fn. 15.

h.  The Debtor's case was still open on the date of the Debtor's filing of this suit; therefore, the Debtor could have amended his Schedule B without having to reopen his case.

46.  On June 25, 2014, District Judge Rosenthal entered an order transferring Civil Action 14-01117 to her court and consolidating it under Civil Action 14-00793. [Debtor's Ex. No. 5, p. 24 of 24]; [Civil Action No. 14-00793, Doc. No. 21]; [Civil Action No. 14-01117, Doc. No. 22].

a.  On October 28, 2014, Judge Rosenthal granted the Motion of New Line and Warner Brothers to Dismiss or Stay in Favor of Ongoing Arbitration; or in the Alternative to Transfer Venue.  [Civil Action No. 14-00793, Doc. No. 44].

b.  On November 4, 2014, District Judge Rosenthal issued a Memorandum Opinion and corresponding order dismissing Civil Action 14-00793 and Civil Action 14-01117 in favor of arbitration.  [Civil Action No. 14-00793, Doc. No. 45, p. 24 of 24]; [Civil Action No. 14-00793, Doc. No. 46].

c.  The Debtor did not notify the Trustee of District Judge Rosenthal's decision.

d.  The Debtor did not amend his Schedule B setting forth that he had a claim in arbitration against New Line that was based upon New Line's alleged misappropriation of the Treatment.

## I. Results of the Arbitration Proceeding

47.  After District Judge Rosenthal issued her dismissal order, the parties proceeded to arbitration in California.  [Hr'g Tr. 157:7–10, Dec. 1, 2015].  The Debtor was represented by two attorneys at this arbitration whose names are Charles W. Grimes and Michael R. Patrick.  [New Line Ex. No. 13, p. 1].  Extensive discovery was

---

[19] *See* fn. 15.

conducted, including depositions; a full evidentiary hearing was held, which included
testimony and the introduction of 497 exhibits; and then the arbitrator took the matter
under advisement.  [Hr'g Tr. 166:3–8, Dec. 1, 2015].  The Debtor failed to notify the
Trustee of the existence of this arbitration proceeding.

48. On February 5, 2015, the arbitrator issued a final arbitration award completely in
favor of New Line and Warner Brothers.  [New Line Ex. No. 13, p. 32 of 32].
Indeed, the arbitrator ruled that the Debtor had failed to meet his burden of proof on
any of his claims, and that "New Line is the prevailing party in this arbitration."  [*Id.*].

49. After the issuance of the final arbitration award in favor of New Line and Warner
Brothers, the Debtor filed an appeal of this award.  [New Line Ex. No. 14].
Meanwhile, the Debtor, through his attorney, conducted negotiations with New Line
and Warner Brothers in an effort to achieve a settlement.  However, no settlement
was ever reached.

**J. The Letter Sent By the Debtor's Attorney to New Line After the Arbitrator Ruled Against the Debtor**

50. On July 20, 2015, Dow, as the attorney for the Debtor and Holdings, e-mailed a letter
to O'Connor, the attorney for New Line (the "Dow Letter").  [New Line Ex. No. 15].
The Dow Letter stated that "we have discovered several other causes of action that we
intend to file against your clients, Lorraine Warren, Tony Spera, New Line
Productions, Inc. ("New Line"), and Warner Bros Entertainment Inc. ("Warner
Bros"), in the very near future," [*Id.* at p. 1 of 73], and further stated that:

> Mr. DeRosa-Grund intends to file a concurrent motion to reopen his
> personal bankruptcy in light of the fact that the above-referenced
> treatment should have been listed as an asset in the original bankruptcy
> matter, but inadvertently was not.  The reopening will address that
> inadvertent error as his treatment was, and remains an asset of the

bankruptcy estate. Mr. DeRosa-Grund and I have already met with the U.S. Bankruptcy Trustee who was originally involved in the bankruptcy, and have explained the facts and circumstances to him. Based on our conversations, he has authorized us to convey to the court that he will not oppose the reopening of the bankruptcy. A copy of the motion to reopen the bankruptcy is also attached.

Finally, Mr. DeRosa-Grund and [Holdings] intend to file a motion with the bankruptcy court requesting a Show Cause Order. Pursuant to the Deal Memo, and the bankruptcy court's order approving the same, Safran and [Holdings] were supposed to be an indivisible producing team. When New Line refused to employ and compensate [Holdings] as producer on any and all sequel productions, New Line was clearly in contempt of the bankruptcy court's order. Because the foregoing original order of the bankruptcy court was part of a core proceeding, this adversarial proceeding cannot be adjudicated in any other forum (i.e. mediation), as bankruptcy courts have the sole and exclusive jurisdiction over core proceedings and proceedings related thereto.

[*Id.* at p. 2 of 73]. After making the above-referenced threat to next sue New Line in bankruptcy court, the Dow Letter subsequently proposes the following: "*If a settlement can be reached, my clients will agree to withdraw all current and contemplated litigation.*" [*Id.* at p. 3 of 73][emphasis added]. Among the attachments to this e-mail was a copy of an unfiled application to reopen the Debtor's case under § 350, and a copy of an unfiled Show Cause Order Against New Line to be filed in the Debtor's case once it was reopened. [*Id.* at pp. 68–73 of 73]. A review of the draft show cause order reflects that the Debtor, together with Holdings, was going to request that this Court impose sanctions of $250,000.00 per day against New Line for its alleged contempt of the Order Approving Agreement. [New Line Ex. No. 15, the last ¶ on the penultimate page].

51. O'Connor, attorney for New Line, understood the Dow Letter to mean that "if [New Line] agreed to [the] demands and paid [the Debtor] the monies that the Arbitration Award denied him, that he wouldn't file the litigation and he wouldn't seek to reopen

26

this bankruptcy case. . ."  [Hr'g Tr. 17:12–16, Dec. 2, 2015].  O'Connor testified that

when he received the Dow Letter, he was "appalled" because "we [] spent 2-1/2 years

litigating the issues in the Arbitration Award and Mr. DeRosa-Grund was essentially

seeking a do-over by making a claim that the Bankruptcy Court was somehow

implicated in this, which is a claim that he had never made." [Hr'g Tr. 15:23; 16:13–

17, Dec. 2, 2015].  No settlement was reached after Dow sent his letter to O'Conner.

**K. Post-Arbitration Lawsuit Filed By the Debtor**

52. On August 7, 2015, the Debtor, as the sole plaintiff, and once again represented by

Dow, filed suit against Time Warner, Inc. ("Time Warner"), Warner Brothers, New

Line, Chad Hayes, Carey Hayes, and Peter Safran in the District Court alleging

copyright infringement, violation of the Lanham Act, and violation of Texas common

law.  [Civil Action No. 15-02273, Doc. No. 1, ¶4].

   a.   The suit was assigned to the Honorable District Judge Nancy F. Atlas.

   b.   The Debtor sought declaratory judgment, injunctive relief, actual and punitive

        damages, attorney's fees, court costs, and pre and post judgment expenses.

        [*Id*.].

   c.   In this lawsuit, the Debtor asserted the following in regard to the Treatment:

        (1) the Debtor wrote the Treatment as a work of fiction, [*Id*. at p. 7]; (2) the

        Debtor attempted to sell the Treatment to motion pictures studios for years

        [*Id*.];   (3) the Debtor sent a copy of the Treatment to Stacey Snider, then

        chairwomen of Dream Works who informed the Debtor she "definitely

        understands the commercial potential for such a deliciously creepy story,

        [*Id*.];" (4) in February of 2009, the Debtor sent a copy of the Treatment to

Gold Circle Films, who "was interested in entering into a deal with [the Debtor], whereby it would acquire the rights to The Conjuring Treatment… however, the two sides [the Debtor and Gold Circle Films] could not ultimately agree to the terms, [*Id*. at 7–8];" (5) New Line and Warner Brothers "unlawfully produced and exploited… 'The Conjuring,' a work derived from the [Debtor's] original story and treatment, [*Id*. at p. 1];" (6) "At no time did [New Line and Warner Brothers] negotiate with the Trustee to exclude the [Debtor's Treatment] from the bankruptcy estate, [*Id*. at p. 2];" (7) New Line and Warner Brothers never filed a motion with the bankruptcy court to exclude the Treatment from the bankruptcy estate, [*Id*.]; and (8) New Line and Warner Brothers never requested that the bankruptcy court transfer the Treatment from the bankruptcy estate to either New Line or Warner Brothers, [*Id*.].

d.  The Debtor requested, among other relief, that New Line and the other defendants be enjoined from "infringing the copyrights in The Conjuring Treatment."   [*Id*. at p. 32 of 36].  Additionally, the relief requested by the Debtor was for "an accounting and restitution… of all gains, profits, and advantages Defendants have derived from their…copyright infringement of The Conjuring Treatment." [*Id*.].

e.  The Debtor did not seek to reopen his case at this time to file an amended Schedule B disclosing this cause of action, which was based, at least in part, on events that occurred prior to the Petition Date (i.e. the Debtor's writing of the Treatment).

    **f.**  The Debtor did not seek to reopen his case at this time in order to file an amended Schedule B disclosing the Treatment.

    **g.**  The Debtor moved to dismiss this suit on August 28, 2015. [Civil Action No. 15-02273, Doc. No. 4]. On this same day, District Judge Nancy Atlas granted this relief. [Civil Action No. 15-02273, Doc. No. 5].

53. On September 22, 2015, the Debtor, representing himself *pro se*, filed yet another suit against Time Warner, Warner Brothers, New Line, Chad Hayes, and Carey Hayes in the District Court alleging copyright infringement, violation of the Lanham Act, and violation of Texas common law. [Civil Action No. 15-02763, Doc. No. 1].

    **a.**  This suit was assigned to the Honorable United States District Judge Alfred H. Bennett.

    **b.**  The Debtor is representing himself *pro se* in this suit.

    **c.**  With regards to the Treatment, the Debtor asserted the exact same allegations previously asserted in Civil Action No. 15-02273 but without Peter Safran listed as a defendant. [*See* Civil Action No. 15-02763, Doc. No. 1 and Civil Action No. 15-02273, Doc. No. 1].

    **d.**  The Debtor requested, among other relief, that New Line and the other defendants be enjoined from "infringing the copyrights in The Conjuring Treatment." [*Id*. at p. 33 of 36]. Additionally, the relief requested by the Debtor was for "an accounting and restitution. . . of all gains, profits, and advantages Defendants have derived from their. . . copyright infringement of The Conjuring Treatment." [*Id*.].

**e.** On December 22, 2015, District Judge Bennett dismissed this suit. [Civil Action No. 15-02763, Doc. No. 16].

## L. The Filing of the Motion to Reopen

54. On September 23, 2015, the Debtor filed the Motion to Reopen. [Doc. No. 92]. Two objections were lodged to the Motion to Reopen; the first was filed by PSG and Gordon on October 14, 2015, [Doc. No. 93], but was later withdrawn on November 25, 2015, [Doc. No. 97]. It was withdrawn because the Debtor paid PSG and Gordon the $576,266.70 New York Judgment on the eve of the Hearing. [*Id.* at p. 2 of 2]. The second objection was lodged by New Line, which was also filed on October 14, 2015. [Doc. No. 94].

55. This Court held a multi-day hearing on the Motion to Reopen on December 1, 2015, December 2, 2015, December 3, 2015, December 7, 2015, on which date the parties delivered closing arguments and the Court took the matter under advisement.

## M. Checks Remitted by New Line to the Debtor or Entities with which He is Affiliated

56. On April 16, 2010, New Line delivered a check for $75,000.00 made payable to the law firm of Stroock & Stroock & Lavan LLP, representing full payment of the initial option payment under the Option Quitclaim Agreement. [New Line Ex. No. 8]. At this time, Stroock & Stroock & Lavan represented the Debtor and the entities with which he is affiliated, and was authorized to serve as the designated recipient for these funds.

57. On January 23, 2012, New Line delivered a check for $385,000.00, made payable to Stroock & Stroock & Lavan LLP, representing a full payment of the purchase price, less the initial option payment and third party rights payments, as set forth in

30

paragraph 4 of the Option Quitclaim Agreement. [New Line Ex. No. 9, p. 3]. At this time, Stroock & Stroock & Lavan was still representing the Debtor and the entities with which he is affiliated, and this law firm was authorized at that time to serve as the designated recipient for these funds.

58. On July 2, 2014, New Line delivered a check to the Debtor for $750,000.00, representing the theatrical sequel rights payment at set forth in paragraph 5(c) of the Option Quitclaim Agreement. [New Line Ex. No. 10]. The check was made payable to "Tony DeRosa-Grund" and "Evergreen Media Holdings, LLC." [New Line Ex. No. 10, p. 2]. New Line sent this check directly to the Debtor at his residential address in Magnolia, Texas. [*Id.*].

### III. CREDIBILITY

There were two witnesses who testified at the Hearing: (1) the Debtor; and (2) O'Connor, an attorney who has extensive involvement representing New Line in the numerous lawsuits that the Debtor has filed against this company; O'Connor's representation has also included the arbitration proceeding. In regards to the credibility of these two witnesses, the Court makes the following findings:

### 1. The Debtor

The Court finds that the Debtor is not a credible witness on several material issues. The Court makes this finding after listening to extensive testimony from the Debtor and, additionally, comparing certain answers that he gave under oath at the Hearing with information that he set forth under oath in his Schedules and SOFA as well as certain allegations that he made, and relief that he requested, in the various lawsuits that he filed against New Line in the District Court. Attached hereto as **Appendix "A"** to this Opinion are this Court's specific observations

and findings about the Debtor's credibility. Because the Debtor is not a credible witness on several issues, the Court gives his testimony little or no weight on these issues. On certain other issues, where the Debtor actually responded to the questions posed to him and where there was no controverting testimony or documentation—for example the Debtor's testimony describing the events that resulted in his writing the Treatment—the Court gives at least some weight to the Debtor's testimony.

### 2. Michael O'Connor

The Court finds that O'Connor is a very credible witness who forthrightly answered the questions posed to him. This Court gives his testimony considerable weight with one exception. The Court gives little weight to his specific testimony that New Line acquired title to the Treatment as a result of the execution of the Option Quitclaim Agreement (as amended), the Producer Loanout Agreement, and the COE. [Hr'g Tr. 30:7–33:19, Dec. 2, 2015]. Given certain language in these documents, the Court understands how O'Conner could, in good faith, honestly testify that he believes that New Line acquired title to the Treatment as a result of these documents. But, the Court places much greater weight on the unambiguous assertion made several months after the execution of these documents by New Line's senior vice president, Alexander stating that: "I'm afraid I [i.e. New Line] can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to introduce that into the credit determination." [Finding of Fact No. 40]. Alexander's statement reflects that New Line's own executive did not believe that New Line had ever acquired title to the Treatment.

# IV. Conclusions of Law

## A. Jurisdiction

The Motion to Reopen is a contested matter under Rule 9014. The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases (which include contested matters) and adversary proceedings to the bankruptcy courts.

## B. Venue

Venue is proper pursuant to 28 U.S.C. § 1408(1), as the Debtor resided in the Southern District of Texas for the 180 days preceding the Petition Date. Specifically, the Debtor resides in Magnolia, Montgomery County, Texas; and this county is located within the Southern District of Texas.

## C. Constitutional Authority of this Court to Enter a Final Order on the Motion to Reopen

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620. The pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because

reopening this case under § 350(b) concerns the administration of the Estate.  Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute (i.e. § 157(b)(2)(C)), this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here.   A core proceeding under § 157(b)(2)(A)—particularly one involving an express Code provision governing the reopening of a case—is entirely different than a core proceeding under § 157(b)(2)(C).  *See, e.g.*, *Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (8th Cir. B.A.P. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also In re Davis*, 538 F. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect'. . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2). . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar.  In *Stern*, the debtor filed a counterclaim based *solely* on state law, and the resolution of that counter claim would not necessarily lead to a determination of the validity or invalidity of the claim filed by the defendant against the debtor's estate.  Conversely,

in the case at bar, the Motion to Reopen is based solely on an express provision of the Code, § 350(b), and judicially-created bankruptcy law interpreting this provision; there is no state law involved whatsoever. This Court is therefore constitutionally authorized to enter a final order on the Motion to Reopen. *See In re Airhart*, 473 B.R. 178, 181 (Bankr. S.D. Tex. 2012) (noting that the bankruptcy court has constitutional authority to enter a final order when the dispute is based upon an express provision of the Code and no state law is involved).

Finally, in the alternative, this Court has the constitutional authority to enter a final order on the Motion to Reopen because the parties in this contested matter have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent. . ."). Indeed, the Debtor filed the Motion to Reopen in this Court, [Doc. No. 92]; New Line filed its response opposing the Motion to Reopen, [Doc. No. 94]; and the parties proceeded to make a record in a multi-day hearing without ever objecting to this Court's constitutional authority to enter a final order on the Motion to Reopen, [*See* Finding of Fact No. 55]. If these circumstances do not constitute consent, nothing does.

### D. Circumstances Under Which the Debtor's Case May be Reopened

A bankruptcy court has the authority to reopen a bankruptcy case under § 350(b) "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). The term "for other cause" is a broad term which gives the bankruptcy court discretion to reopen a

closed estate when cause for such reopening has been shown.  *Matter of Case,* 937 F.2d 1014, 1018 (5th Cir.1991).

In the case at bar, the Debtor, pursuant to Rule 5010, requests that this Court reopen his case to allow the Trustee to administer an asset—namely, the Treatment—that the Debtor asserts he owned on the Petition Date but inadvertently failed to disclose.  New Line vigorously opposes the reopening of the case; alternatively, New Line argues that if the case is reopened, then the Debtor should be estopped from receiving any proceeds from the Trustee's sale or other disposition of the Treatment because the Debtor's failure to initially disclose the Treatment was not inadvertent.  *See e.g.*, *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999); *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334-35 (5th Cir. 2004) (holding that where nondisclosure of an asset is not inadvertent, the debtor is estopped from taking action concerning this asset that would personally benefit him financially).   Under these circumstances, the threshold question for this Court is to determine whether the Debtor, in his individual capacity, actually owned the Treatment on the Petition Date.  If he did not own this asset, then there is no basis to reopen the case, as the Trustee would have no asset to administer. Conversely, if the Debtor did own the Treatment on the Petition Date, then there is a sound basis for reopening: namely, for the Debtor to schedule the Treatment, which in turn would allow the Trustee to administer this asset and use any proceeds from its sale or other disposition to pay off remaining allowed claims—in part, if not in whole.  [*See* f.n. 4, describing the existing unpaid allowed claims of approximately $185,000.00 in the aggregate].

For the reasons set forth below, the Court concludes that the Debtor did own the Treatment on the Petition Date, and that therefore the Motion to Reopen should be granted so that the Debtor can amend his Schedule B to disclose the Treatment and, further, so that the

Trustee can then sell or otherwise dispose of this asset in order to generate proceeds to pay the remaining allowed claims.  This Court, although granting the Debtor's request to reopen his case, will nevertheless bar the Debtor: (1) from having any standing to object to any proposed sale or other disposition of the Treatment by the Trustee; and (2) from receiving the excess proceeds, if any, after payment of all allowed claims and the Trustee's fee.  Relying upon Fifth Circuit precedent, the Court imposes this bar against the Debtor because it has concluded that the Debtor's failure to initially disclose the Treatment was not inadvertent. *See Reed v. City of Arlington*, 650 F.3d 571 (5th Cir. 2011); *Love v. Tyson Foods Inc.*, 677 F.3d 258 (5th Cir. 2012); *In Re Jackson*, 2012 WL 3071218, *aff'd* per curiam by the Fifth Circuit on direct appeal at *In Re Jackson*, 574 F. App'x 317 (5th Cir. 2014).[20]

> ### E. The Debtor, in His Individual Capacity, Owned the Treatment on the Petition Date and Therefore the Case Should Be Reopened So That the Trustee Can Administer This Asset for the Benefit of Creditors Whose Claims Remain Unpaid

As already noted above, in deciding whether to grant the Motion to Reopen, this Court must necessarily determine whether the Debtor, in his individual capacity, owned the Treatment on the Petition Date.  It is Black Letter law that all assets owned by a debtor on the date of the filing of his bankruptcy petition become property of the bankruptcy estate.  11 U.S.C. § 541(a); *In re Carlton*, 309 B.R. 67, 71 (Bankr. S.D. Fla. 2004) ("11 U.S.C. §

---

[20] The Debtor will no doubt be unhappy with this Court's ruling and may have second thoughts about wanting to reopen his case to amend his Schedule B to disclose the Treatment.  So that there is absolutely no confusion in the Debtor's mind, he will have no choice but to amend his Schedule B.  The order that this Court will enter reopening this case will require the Debtor to amend his Schedule B to disclose the Treatment.  *In re Paine*, 250 B.R. 99, 106 (B.A.P. 9th Cir. 2000) ("Furthermore, § 105(a) authorizes a bankruptcy court to act *sua sponte* to order the debtors to amend the schedules or statements.").  Further, this Court will require the Debtor to not only list the Treatment on his Schedule B, but it will require him to set forth the value of this asset.  *See In re Solly*, 392 B.R. 692, 697 (Bankr. S.D. Tex. 2008) ("The Court finds that it is inconsistent with the intent of the Code to permit a debtor to schedule the value of an asset as 'unknown.'  Accordingly, in the case at bar, the Debtor must amend her Schedules to set forth a specific dollar value on the Malpractice Claim.").  The Court will also require the Debtor to amend his Schedule B to disclose all other assets that he should have listed in his initial Schedule B—for example, his interest in Silverbird.

541(a)(1) defines property of the estate to include all legal or equitable interests of the debtor in property as of the commencement of the case.").

At the Hearing, the Debtor testified that he—and he alone—wrote the Treatment. Specifically, he testified as follows:

> And at that point the light bulb really went off and it was a stream of consciousness. And for the next 15 or 20 minutes on the tape I gave him what I thought would be the way to make a movie out of this. You know, the story, the start, the finish, the first act, middle, the ending. And that was really the beginning of all of this. . . I took that tape and then I wrote a treatment. I mean, I put the words on the paper and made a written treatment of it. And I, you know, enhanced it and embellished it and added some things to it. You know, sort of fine-tuned it.

[Hr'g Tr. 41:11–22, Dec. 1, 2015]. This testimony leaves no doubt that the Debtor, and only the Debtor, developed the Treatment; therefore, he became its owner at the time of its creation. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The creator of the property is the owner, unless he is an employee creating the property within the scope of his employment."). Indeed, New Line does not dispute that the Debtor wrote the Treatment, and that he had an interest in the Treatment when he completed it. And, because the Debtor developed the Treatment several years prior to the Petition Date, [Findings of Fact Nos. 6 & 11], the Treatment became property of the Debtor's Chapter 7 estate on the Petition Date—unless the Debtor conveyed the Treatment to some third party prior to the Petition Date.

According to the Debtor, he has always owned the Treatment. [Hr'g Tr. 124:19–23, Dec. 1, 2015]. Specifically, when asked whether he has always owned the Treatment, the Debtor responded as follows: "I would say yes, I didn't think about it, but I would say that I believed I've always owned it." [*Id.*]. Later in the Hearing, the Debtor once again reiterated that he—and he alone—has always owned the Treatment:

38

Q: Okay. So you told us that, to summarize here, you never let go of ownership of "The Conjuring" rights is what you testified, and the Perron rights and the Warren rights were transferred to my client after you filed your Bankruptcy Schedules, right?  Yes or no?
A: If I can parse it out.
Q: Yes or no?
A: *I always owned "The Conjuring" treatment rights*.  When you conflate "The Conjuring" rights to include everything, it can't include everything, because they're separate and discreet bundles of rights.  You got—never got the treatment, your client never got the treatment rights.  They got the rights from the Perron family under the bankruptcy agreement, and they got the Warren's rights under the Option Quitclaim Agreement, and that's the correct statement.

[Hr'g Tr. 153:14–154:3, Dec. 1, 2015][*emphasis added*].

At the Hearing, there was no contrary testimony or documentation indicating that the Debtor sold the Treatment prior to the Petition Date.  Granted, several years prior to the Petition Date, Silverbird acquired the Perron Life Rights.  [Finding of Fact No. 7].  And, granted, three months before the Petition Date, Silverbird conveyed—or attempted to convey—the Perron Life Rights to Evergreen.  [Finding of Fact No. 8].  Granted also, that Holdings acquired both the Perron Life Rights and the Warren Life Rights, possibly prior to the Petition Date.  [Finding of Fact No. 9].  But, the Treatment is a separate and distinct asset from the Perron Life Rights and the Warren Life Rights, [Hr'g Tr. 153:21–154:3, Dec. 1, 2015]; [Hr'g Tr. 21:1-9, Dec. 2, 2015]; [Hr'g Tr. 59:3–8, Dec. 2, 2015], and there is no written document evidencing that prior to the Petition Date, the Debtor ever conveyed the Treatment to Silverbird, Evergreen, Holdings or, for that matter, to any other entity or person.  Thus, this Court finds that as of the Petition Date, the Debtor owned the Treatment.  And, because the Debtor owned the Treatment as of the Petition Date, this Court finds that the Treatment became property of the Debtor's chapter 7 estate on the Petition Date and that the Trustee, by operation of law, took title to the Treatment on this date. *In Re Calvin*, 329 B.R. 589, 602 (Bankr. S.D. Tex. 2005) ("When a debtor files a Chapter 7 petition, the debtor is automatically divested of virtually all property interest held as of the

commencement of the case and, in turn these interest immediately vest in the estate.") (internal quotes and citations omitted);  *see also In re Engman*, 395 B.R. 610, 617 (Bankr. W.D. Mich. 2008) (providing an overview of the purpose of Chapter 7 and the duties of a trustee, including conveying title to sell estate assets in order to generate proceeds to pay claims).[21]

New Line takes the position that it purchased the Treatment by virtue of the Option Quitclaim Agreement, the Producer Loanout Agreement, and the COE.  [*See* Findings of Fact Nos. 29, 30, & 31]; [Hr'g Tr. 30:7–31:19, Dec. 2, 2015].  The Court rejects this position for two reasons.  First, several months after the execution of these documents, Alexander, the senior vice president and head of business and legal affairs of New Line, responded to an email from the Debtor concerning a proposed settlement over the Debtor's contention that New Line was misappropriating the Treatment to develop the screenplay for "The Conjuring."  [Finding of Fact No. 40].  Alexander's response, set forth in an email dated October 7, 2010, was as follows: "I'm afraid I [i.e. New Line] can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to introduce that into the credit determination."  [*Id.*].  This language unambiguously shows that New Line's own executive did not believe that New Line had purchased the Treatment as a result of the execution of the Quitclaim Agreement, Producer Loanout Agreement, or the COE.[22]

Second, even if the Quitclaim Agreement (as amended), the Producer Loanout Agreement, and the COE did transfer title of the Treatment from the Debtor to New Line, such

---

[21] The Petition Date was the date that the involuntary was filed against the Debtor, not the date that the order for relief was entered.  There is no question that when an involuntary petition is filed, its filing creates an estate consisting of all of the putative debtor's property.  11 U.S.C. § 303(b)(1) & (h)(1); *In re E.D. Wilkins Grain Co.*, 235 B.R. 647, 649 (Bankr. E. D. Cal. 1999).  Thus, the Treatment became property of the Estate on May 7, 2009 (i.e. the Petition Date), not June 8, 2009 (i.e. the date the order for relief was entered on the docket).

[22] New Line, the Debtor, Holdings, Silverbird, and Evergreen did execute an 11-page amendment to the Option Quitclaim Agreement on October 19, 2010—i.e. ten days after Alexander's email, [New Line Ex. No. 7]—but the Court does not find any language contained in this amendment whereby the Debtor conveys the Treatment to New Line.

40

transfer is void. This is so because these agreements were executed only by New Line, Holdings, the Debtor, Silverbird and Evergreen, [Findings of Fact Nos. 29, 30, & 31]; the Trustee was not a party to these agreements and he never executed these agreements, [Finding of Fact No. 32]— nor, for that matter, did the Trustee ever execute any document conveying the Treatment to New Line or any other third party. [*Id.*]. For New Line to take title to the Treatment, it must have a bill of sale (or other similar document) executed by the owner of the Treatment—which is the Trustee; a bill of sale or assignment executed by the Debtor does not effectuate the conveyance. *See Calvin*, 329 B.R. at 602 ("Title [to assets that became property of the estate on the filing date] does not revest in the debtor until the property is either properly claimed and allowed as exempt, or abandoned by the trustee.").[23]

Indeed, because the Treatment is property of the Estate that is subject to the exclusive jurisdiction of this Court, for New Line to take title to the Treatment, it must not only have a bill of sale from the Trustee; there must also be an order from this Court approving the Trustee's sale to New Line. *See, e.g.*, *In re Sunland, Inc.*, 507 B.R. 753, 759 (Bankr. D.N.M. 2014) ("[A]bsent court approval, an agreement to sell estate property outside the ordinary course of business is not a binding contract"); *In re Missler*, 418 B.R. 259, 262 (Bankr. N.D. Ohio 2009) ("In order to facilitate a trustee's duty to administer a debtor's bankruptcy estate, § 363 empowers a trustee to sell estate property. This power, however, is circumscribed in a number of respects. The first such limitation, for example, set forth in § 363 provides that court approval is necessary before a trustee may sell property of the estate outside the ordinary course of business.")(internal quotes and citations omitted). Because this Court has never approved a sale of the Treatment to New Line, this Court finds that New Line has never taken title to this asset and that this asset remains

---

[23] The Treatment has never revested in the Debtor because: (1) the Trustee has never abandoned this asset; and (2) the Debtor has never claimed it as exempt property.

property of the Estate.  *In re Smith*, 352 B.R. 500, 501 (Bankr. N.D. Ala. 2006) ("Court approval

is a prerequisite before a contract can become binding upon the bankruptcy estate."); *In re*

*Lavigne*, 183 B.R. 65, 69 (Bankr. S.D.N.Y. 1995) *aff'd*, 199 B.R. 88 (S.D.N.Y. 1996) *aff'd*, 114

F.3d 379 (2d Cir. 1997) ("an extraordinary transaction undertaken by the debtor or trustee

without notice and a hearing is unenforceable"); *In re Zeman*, No. 09-52559-C, 2010 WL

3123144, at *2 (Bankr. W.D. Tex. Aug. 6, 2010) ("If a debtor, acting with the powers of a

Trustee, disposes of property out of the ordinary course of business without prior court approval,

then the transaction may be unwound as invalid.").

It is true that New Line paid $100,000.00 to the Trustee pursuant to the Trustee's Motion.

[Findings of Fact Nos. 34, 36, & 37].  However, this payment was *not* in exchange for the sale of

the Treatment by the Trustee.  Rather, in exchange for this payment, the Trustee released any

claims for injunctive relief that the Estate had against New Line for the "exploitation, marketing,

distribution or production of the material described in the Deal Memo. . .  arising out of the

execution of and performance under any of the agreements contemplated by the Deal Memo."

[Finding of Fact No. 36].  Further, the Trustee accepted the $100,000.00 in "full satisfaction and

release of any claims for injunctive relief that the Estate has, had or may come to have against

New Line arising out of or relating to the transfer of intellectual property and any other rights

associated therewith or related thereto contemplated by the Deal Memo."  [*Id*.].  In sum, New

Line's payment of $100,000.00 to the Trustee did *not* transfer title of the Treatment to New Line;

rather, New Line's $100,000.00 payment seems to bar the Trustee from—among other actions—

seeking to enjoin New Line from using the Treatment to develop a screenplay for the "The

Conjuring."  Thus, the Treatment remains property of the bankruptcy estate.

As previously noted, § 350(b) allows this Court to reopen a debtor's case "to administer assets."  In the case at bar, an asset exists: the Treatment.  Of course, the basis for reopening a case is particularly compelling if there is an asset in existence that has value.  *In re Winburn*, 196 B.R. 894, 898 (Bankr. N.D. Fla. 1996) ("[T]he facts and circumstances surrounding this case compel reopening, even after four years. The "asset", as it currently stands, has a potential value in excess of $5 million dollars."); *In re Ward*, 60 B.R. 660, 662 (Bankr. W.D. La. 1986).  Here, the Treatment seems to have value to the extent that New Line has used the Treatment—without paying for such use—in producing "The Conjuring" because this movie has grossed over $300 million in revenues worldwide, [Finding of Fact No. 42].  The Treatment may also have value to the extent that New Line has used the Treatment to produce sequels to "The Conjuring."[24]  The exact amount of the value of the Treatment is unclear based upon the record before this Court. Neither party adduced testimony or introduced exhibits on this particular point, and this Court presently makes no specific finding as to the exact amount of the Treatment's value.  At this juncture, the Court finds only that the Treatment appears to have some value—at least sufficiently so that cause exists to reopen the Debtor's case and allow the Trustee to investigate its value and to determine whether and how to administer the Treatment.  *In re Nagy*, 432 B.R. 564, 568 (Bankr. M.D. La. 2010) ("[T]he trustee has a duty to investigate the value to the estate of scheduled property and to decide whether the property should be administered. . .").

In sum, because the Debtor owned the Treatment on the Petition Date, the Treatment became property of the Estate and should have been disclosed by the Debtor.  Because it was not

---

[24] The parties do not dispute that a sequel to "The Conjuring" is forthcoming.  [*See* Hr'g Tr. 17:19–21, Dec. 1, 2015]. "The studio has set a release date for the film, putting it smack in the middle of the warm season on June 10, 2016." Tyler McCarthy, *The Conjuring 2' Release Date Announced; Everything We Know About 'The Enfield Poltergeist' June 2016 Premiere*, INT'L BUS. TIMES, Nov. 12, 2014, available at: http://www.ibtimes.com/conjuring-2-release-date-announced-everything-we-know-about-enfield-poltergeist-june-1722701.

disclosed, and because title has continuously remained in the Estate up to this date, it is an asset that the Trustee needs to administer, as there are still unpaid allowed claims of approximately $185,000.00 that could be paid if the Trustee can generate proceeds from the sale or other disposition of the Treatment.  [Debtor's Ex. No. 4, pp. 4–5 of 12].  Stated differently, there are two reasons under § 350 to reopen this case: (1) there is an asset to be administered, i.e. the Treatment; and (2) cause exists because this asset seems to have some value, which in turn means that there is a possibility that the Trustee can monetize this asset to generate proceeds for distribution to allowed claims that still have not yet been paid.  *Nagy*, 432 B.R. at 568.

Under the circumstances described above, this Court will grant the Motion to Reopen; and to this extent the Debtor has succeeded in his objective of reopening his case in order to amend his Schedule B to disclose the Treatment and afford the Trustee the opportunity to administer this asset for the benefit of those creditors whose allowed claims remain unpaid. However, to the extent that the Debtor expects to benefit himself from the Trustee's sale or other disposition of the Treatment, the Debtor will be sorely disappointed.  This Court, which has wide discretion whether to reopen the case and, if so, whether to place any conditions thereon, *see*, *e.g.*, *Citizens Bank & Trust Co. v. Case (In re Case),* 937 F.2d 1014, 1018 (5th Cir.1991), has decided to place restrictions on the Debtor.  Specifically, as discussed below in section IV(F), because this Court finds that the Debtor's failure to initially disclose the Treatment was not inadvertent, this Court invokes the doctrine of judicial estoppel to bar the Debtor from ever benefitting from the Trustee's administration of the Treatment.

At the Hearing, counsel for the Debtor suggested that it would be premature for this Court to invoke the doctrine of judicial estoppel and that this Court should only focus on whether the case should be reopened to allow the Debtor to amend his Schedule B and provide the

Trustee with the opportunity to administer the Treatment.  Counsel seemed to suggest that no decision should be made on the Debtor's rights to any excess proceeds from the Trustee's sale or other disposition of the Treatment unless and until this asset is sold, all allowed claims are paid, and there is an actual excess of monies available for distribution to the Debtor.  [Hr'g Tr. 73:15–75:15, Dec. 7, 2015].  This Court disagrees with counsel for the Debtor that this particular issue is not ripe.  First, New Line has raised this issue.  [Hr'g Tr. 29:14-33:2, Dec. 1, 2015]; [Hr'g Tr. 26:16-57:6, Dec. 7, 2015].  Second, even if New Line had not raised the issue, this Court has the right—indeed, it has the independent duty—to raise judicial estoppel *sua sponte*.  *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 530 (5th Cir. 2000) ("Judicial estoppel is *not* raised; but, because that doctrine protects the judicial system,  we can apply it *sua sponte* in certain instances.") (internal citation omitted);  *In re Airadigm Communications, Inc.,* 616 F.3d 642, 664, n. 14 (7th Cir.2010) ("The FCC did raise the issue of judicial estoppel in its opening brief. . ., although the doctrine can be raised by courts *sua sponte* because judicial estoppel concerns the integrity of the judicial system independent of the interests of the parties.").

### F. The Principle of Judicial Estoppel Bars the Debtor From Ever Benefiting from the Trustee's Administration of the Treatment

 "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  *Reed,* 650 F.3d at 573–74 (quoting 18 James Wm. Moore et al., Moore's Federal Practice § 134.30 at 63 (3d ed.2011)).  "In a bankruptcy case, judicial estoppel both deters the dishonest debtors—whose failure to fully and honestly disclose all their assets undermines the integrity of the bankruptcy system—and protects the rights of creditors to an equitable distribution of the estate's assets."  *In re Jackson*, No. 06-36268, 2012 WL 3071218, at *26 (Bankr. S.D. Tex. July 27, 2012) citing  *Id.* at 574.  Where a debtor "fails to disclose an asset to a bankruptcy court, but then

pursues a claim in a separate tribunal based on that undisclosed asset," judicial estoppel is particularly appropriate. *Jethroe v. Omnova Solutions, Inc.,* 412 F.3d 598, 600 (5th Cir. 2005). "In assessing whether judicial estoppel should apply, we look to see whether the following elements are present: (1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *In re Jackson*, No. 06-36268, 2012 WL 3071218, at \*26.; *Superior Crewboats*, 374 F.3d at 335.

### 1. Element #1: The Debtor has Asserted a Legal Position in the District Court which is Plainly Inconsistent with the Initial Position that He Asserted in this Court

In the case at bar, the Debtor initially represented to this Court that he did not own the Treatment. He made this representation precisely because he did <u>not</u> list this asset on his Schedule B. [Finding of Fact No. 21]. However, after the Debtor received his discharge, he began filing suit in the District Court representing to that Court that he <u>did</u> own the Treatment and that he wanted a judgment against New Line for damages resulting from New Line's alleged misappropriation of the Treatment. [Findings of Fact Nos. 44, 45, & 52]. Thus, the first element of judicial estoppel has been met.

### 2. Element #2: Prior to the Debtor's Assertion in the District Court that He Owned the Treatment, This Court Had Already Accepted the Debtor's Prior Representation in this Chapter 7 Case that He Owned No Interest in this Asset.

On July 26, 2010, this Court issued a discharge to the Debtor, [Finding of Fact No. 27], because this Court had accepted his initial position that the only assets he owned on the Petition Date were those listed on his Schedules A and B; namely, that he owned the following assets: (1) one red fabric recliner; (2) miscellaneous personal clothes; (3) a stock interest in Gallow Hill Pictures, LLC; (4) a stock interest in Evergreen Media Group, LLC; and (5) a pending patent application. [Debtor's Ex. No. 2]; [Findings of Fact Nos. 16 & 17]; [Doc. No. 19, pp. 3–7 of 31].

Stated differently, this Court issued a discharge to the Debtor because this Court had accepted his initial position that he did not own the Treatment, as this asset was not listed on his Schedules. After this Court accepted the Debtor's representation that he did not own the Treatment, the Debtor asserted an inconsistent legal position in the District Court by seeking a judgment against New Line for damages resulting from New Line's alleged misappropriation of the Treatment. [Findings of Fact Nos. 44, 45, 52 & 53]. Thus, the second element of judicial estoppel has been met.

There is also another basis for this Court to conclude that the second element of judicial estoppel has been satisfied. In the Trustee's Motion, he set forth that the Debtor represented to him that the Estate lacks any interest "in the rights related to the movie" and that the Estate "currently does not have a penny." [Finding of Fact No. 34a & c]. The Trustee's Motion contained language setting forth that any response had be filed within 21 days, and there is no question that the Debtor and his counsel of record received this motion. [Doc. No. 33, p. 5 of 5]. The Debtor filed no response to the Trustee's Motion, nor did any other creditor or party in interest. [Finding of Fact No. 35]. In reliance upon the representations made in the Trustee's Motion, as well as the fact that no responses thereto were filed, this Court entered an order approving the Trustee's Motion. [Finding of Fact No. 36]. Stated differently, this Court approved the $100,000.00 agreement negotiated by the Trustee with New Line because the Court had no information suggesting that the Estate had any rights "related to the movie" and therefore there seemed to be no viable alternative to bringing in any money into the Estate for distribution to creditors. Yet, at the time the Trustee's Motion was filed, the Debtor did, in fact, have information that the Estate had certain rights "related to the movie." This is so because the Debtor believed at the time of the filing of the Trustee's Motion that he owned the Treatment—

and he had always believed that he owned the Treatment [Hr'g Tr. 153:14–154:3, Dec. 1, 2015]. Moreover, the Debtor knew that New Line might want to purchase the Treatment to develop the script/screenplay for "The Conjuring." [*See* Hr'g Tr. 11:25–13:22, Dec. 3, 2015];[New Line Ex. No. 15, p. 3]. Because the Debtor owes a duty to make complete disclosure of all his assets *In re Coastal Plains, Inc.*, 179 F.3d at 207-08, he had duty to speak up—in this instance, to file a response informing the Court that the Trustee's allegation that "the Estate lacks any interest in the rights related to the movie" was incorrect. The Debtor had a duty to inform the Court that the Estate did, in fact, have an interest in a right related to movie: namely, the Treatment. If the Court had known that the Estate owned the Treatment, it might not have approved the Trustee's Motion, but instead informed the Trustee that the $100,000.00 agreement was not sufficiently beneficial to the Estate and that he needed to return to the bargaining table with New Line to attempt to obtain greater consideration for the Estate.

The Fifth Circuit has held that: "[s]ilence alone, where there is a duty to speak, may create an estoppel." *Ashland Oil & Ref. Co. v. Beal*, 224 F.2d 731, 738 (5th Cir. 1955). "From pure but misleading silence, coupled with a duty to speak, an estoppel will arise." *Id*. The Debtor's failure to file a response to the Trustee's Motion led this Court to accept the incorrect allegation in the Trustee's Motion that "the Estate lacks any interest in the rights related to the movie" and thereby approve the relief requested by the Trustee. After this Court accepted this incorrect allegation, the Debtor subsequently took an inconsistent legal position in the District Court by asserting that he owned the Treatment and that New Line should be required to pay him damages resulting from its alleged misappropriation of the Treatment. [Findings of Fact Nos. 44, 45, 52 & 53]. Thus, under these circumstances, the second element of judicial estoppel is met.

### 3. Element #3: the Debtor Did Not Inadvertently Fail to Disclose the Asset.

A "debtor's failure to satisfy its statutory disclosure is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed [asset] or has no motive for [its] concealment." *In re Coastal Plains, Inc.*, 179 F.3d at 210. Neither consideration exculpates the Debtor in the case at bar. The evidence reflects that: (1) on the date that the Debtor signed his Schedule B under oath—which was July 10, 2009 (the "Schedule Date")—the Debtor had knowledge of the Treatment; and (2) the Debtor did indeed have a motive to conceal the Treatment from his creditors.

### i. As of the Petition Date, the Debtor had Knowledge of the Treatment

The Debtor's own testimony at the Hearing reflects that he had knowledge of the Treatment. First, when asked why he did not disclose the Treatment, the Debtor responded as follows: "[B]ecause I didn't have a registration on it sir." [Finding of Fact No. 22]. The Debtor's answer unequivocally shows that he knew about the existence of the Treatment as of the Schedule Date. While the fact that the Treatment was unregistered is not a sound basis for failing to disclose this asset, what is key for purposes of analyzing inadvertence is whether the Debtor knew about the existence of the Treatment. His answer clearly indicates that he knew about this asset.

Second, the Debtor testified that he did not schedule the Treatment because "I didn't think it had any value." [Finding of Fact No. 23]. Once again, the Debtor's answer unequivocally shows that he knew about the Treatment. And, once again, while the fact that the Treatment may not have had any value in his mind is not a sound basis for failing to disclose this asset,[25] what is key for purposes of analyzing inadvertence is whether the Debtor knew about the

---

[25] Case law is clear that the debtor's "belief that an interest has no value does not except it from being scheduled." *In re Darr*, 472 B.R. 888, 899 (Bankr. E.D. Mo. 2012). Stated differently, "[a] debtor's belief that property had no

existence of the Treatment on the Schedule Date.  His answer clearly indicates that he knew about this asset.

Indeed, when responding to the question as to why he did not schedule the Treatment, the Debtor never asserted that he failed to schedule this asset on the grounds that he did not know about it or did not own it.  In fact, two exchanges between New Line's counsel and the Debtor at the Hearing leaves no doubt that the Debtor had knowledge of the Treatment as of the Schedule Date *and* that he believed he owned the Treatment on this date:

> Q: You always believed that you owned [the Treatment] even at the time at that you filled out the Bankruptcy Schedules, right?
> A: *I would say yes, I didn't think about it, but I would say that I believed I've always owned it.*
>
> [Hr'g Tr. 124:19–23, Dec. 1, 2015][*emphasis added*].

> Q: Okay. So you told us that, to summarize here, you never let go of ownership of "The Conjuring" rights is what you testified, and the Perron rights and the Warren rights were transferred to my client after you filed your Bankruptcy Schedules, right?  Yes or no?
> A: If I can parse it out.
> Q: Yes or no?
> A: *I always owned "The Conjuring" treatment rights*.  When you conflate "The Conjuring" rights to include everything, it can't include everything, because they're separate and discreet bundles of rights.  You got—never got the treatment, your client never got the treatment rights.  They got the rights from the Perron family under the bankruptcy agreement, and they got the Warren's rights under the Option Quitclaim Agreement, and that's the correct statement.
>
> [Hr'g Tr. 153:14–154:3, Dec. 1, 2015][*emphasis added*].

Thus, this Court finds that the Debtor did not lack knowledge of the Treatment as of the Schedule Date. Moreover, this Court finds that the Debtor affirmatively knew about the existence of the Treatment and, in his mind, believed that he owned this asset. The Court's

---

value is not license to omit it from Schedule B."  *Id.* at 897; *see also In re McCarthy*, 488 B.R. 814, 828 (B.A.P. 1st Cir. 2013) ("In addition, a debtor cannot claim that he omitted an asset because it had little or no value.").

findings mean that inadvertence cannot be satisfied unless the Debtor can prove that he had no motive for concealing the Treatment. *In re Jackson*, No. 06-36268, 2012 WL 3071218, at *31 (Bankr. S.D. Tex. July 27, 2012), citing *In re Coastal Plains, Inc.*, 179 F.3d at 210.

### ii. The Debtor had Motive to Conceal the Treatment

In *Love,* the Fifth Circuit's discussion on when motive to conceal exists makes it very difficult for any debtor to show that he had no motive to conceal what he failed to disclose. Specifically, the Fifth Circuit declared that "the motivation sub-element is almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court. Motivation in this context is self-evident because of potential financial benefit resulting from the nondisclosure." *Love,* 677 F.3d at 262 (citing *Thompson v. Sanderson Farms, Inc.,* 2006 U.S. Dist. LEXIS 48409, 12–13 (S.D.Miss. May 31, 2006) (citation omitted)). Granted, in *Love,* what the debtor failed to disclose was a cause of action—as opposed to literary material such as the Treatment— but this Court sees no logical reason why the very high bar that the Fifth Circuit has established in *Love* for debtors to prove that they had no motive to conceal a cause of action should be any lower when debtors are attempting to prove that they had no motive to conceal any other type of asset, such as the Treatment. After all, it can be just as compellingly argued that motivation for potential financial benefit resulting from nondisclosure is self-evident when the nondisclosure is literary material such as the Treatment.[26]

In performing its analysis, this Court notes that the Fifth Circuit left the "no motive" door open very slightly by stating that "the motivation sub-element is *almost always* met if a Debtor fails to disclose a claim or possible claim to the bankruptcy court." *Id.* (emphasis added). The

---

[26] Indeed, because the Debtor filed suit and based one of his causes of action on the grounds that New Line had misappropriated the Treatment and therefore owed him damages, [Findings of Fact Nos. 44, 45, 52 & 53], the Debtor's conduct is very similar to the debtor's conduct in *Love* because in the case at bar, the Trustee is also the proper party-plaintiff in any suit brought by the Debtor against New Line for misappropriating the Treatment.

words "almost always" indicate that the Fifth Circuit recognizes that there are certain circumstances where nondisclosure of an asset does not automatically establish motivation. In *Love,* the Fifth Circuit did not articulate any laundry list of examples where nondisclosure does not automatically establish motivation, so presumably this exception to the general rule is left up to the sound discretion of the bankruptcy court. The Fifth Circuit does, however, emphasize one factor that a bankruptcy court should consider when assessing whether motivation exists when there is nondisclosure: "When reviewing potential motive, the relevant inquiry is intent at the time of non-disclosure." *Id.* at 263 (citing *Robinson v. Tyson Foods,* 595 F.3d 1269, 1276 (11th Cir. 2010)).

Here, the Debtor had motive to conceal the Treatment on the Schedule Date. By failing to disclose the Treatment on his Schedule B, the Debtor was able to receive a general discharge from this Court for debts exceeding $1.0 million, [Finding of Fact No. 28], while simultaneously pursuing financial gain from this undisclosed asset—i.e. seeking some unspecified amount of dollars from New Line for its use of the Treatment to develop the screenplay for and thereafter produce "The Conjuring." The Debtor's conduct has effectively deprived his creditors from having any chance to receive full payment on their claims.[27]

Indeed, only a few months after filing his Schedule B without disclosing the Treatment, the Debtor began threatening New Line with a lawsuit on the grounds that it was misappropriating the Treatment in order to develop a screenplay for "The Conjuring." This threat came not only less than three months after the Schedule Date; it came less than ten weeks after the Debtor received his discharge, which was July 26, 2010 (the "Discharge Date"). And, it

---

[27] It is no small point that the Debtor's actions sought to avoid paying not only the creditors who held dischargeable debts, but also the two creditors who held the judgment that was a nondischargeable debt—i.e. the $576,266.70 New York Judgment. [*See* Findings of Fact Nos. 25 & 26]. It was only after the Debtor filed the Motion to Reopen and drew an objection thereto from these two creditors did he decide to pay them off—in effect to purchase their agreement to withdraw their opposition to the Motion to Reopen. [*See* Doc. No. 97].

came while the Debtor's case was still open, so the Trustee was still fulfilling his duties of trying to locate assets of the Estate to administer.  Specifically, on October 7, 2010, the Debtor sent a very hostile email to New Line's senior vice president and head of business and legal affairs (Craig Alexander).  [Finding of Fact No. 40].  The Debtor sent this email less than one hour after receiving an email from Alexander in which Alexander stated that: "I'm afraid I [i.e. New Line] can't buy your treatment. I don't think the writers ever saw it, and it would not be fair to them to introduce that into the credit administration."  [*Id*.].  The Debtor, upset by this statement, responded with the following threat:

> [A]t least 60-65% of that story [for the screenplay of "The Conjuring"] if not more, is from *my treatment*… I shut my mouth up till now to get this [movie] made, but no more. All bets are off. I had this conversation with Peter Safran a while back and also with John, even before there were any 'issues' that this script was based on *my story/treatment* and transited way beyond any producer duties, so shouldn't I be credited/paid for that work. No more Mr. Nice Guy, no more patience. No one rips me creatively or otherwise. So I'll just sue everyone here because I have had enough of being defrauded and now screwed with. See you in court.

> [*Id*.][*emphasis added*].

The language that the Debtor used in this email unequivocally shows that: (1) the Debtor believed that he owned the Treatment; (2) the Debtor believed that New Line was improperly using the Treatment to develop the script (or screenplay) for "The Conjuring;" (3) the Debtor wanted New Line to pay him for its use of the Treatment; and (4) if New Line would not pay him for its use of the Treatment, he would file suit against New Line.  The Debtor's own language thus shows that he had a motive to conceal the Treatment from his creditors: he wanted New Line to pay him directly for its use of the Treatment—as opposed to paying the Trustee (who would then use the proceeds to pay the Debtor's creditors).

Indeed, the Debtor's very specific language in this email reflects not only a financial motive in not disclosing the Treatment on his Schedule B; it reflects a criminal intent.  His statement that "I shut my mouth up till now to get this made" suggests that he committed a bankruptcy crime by deliberately lying under oath in his Schedule B (by not disclosing the Treatment) because he believed that if he had disclosed it, then linking it to his bankruptcy would have undermined the development of the script for the "The Conjuring."  *See*, *e.g.*, *In Re Woodruff*, 78 B.R. 554, 555 (Bankr. E. D. Ark. 1987) (citing 18 U.S.C. § 152, the court states that "[t]he debtor perjured himself and gave a false oath when he submitted his 1984 bankruptcy petition [and] schedules. Thereon he signed a statement, under oath, that the information contained in the schedules was true and correct."); *In re Arana*, 456 B.R.161, 169 (Bankr. E.D.N.Y. 2011) ("And the knowing and fraudulent concealment of property belonging to the estate of a debtor is a federal crime punishable by a fine, a prison term of up to five years, or both.").  Stated differently, the Debtor deliberately did not disclose the Treatment on his Schedule B because he wanted the screenplay for "The Conjuring" to be developed as quickly as possible—through the use of the Treatment—and this objective could be best accomplished by his hiding this asset from the bankruptcy process and directly selling it himself to New Line.

In sum, just ten weeks after he received his discharge but while his case was still open, the Debtor, having received the ultimate benefit from the bankruptcy system, was abusing the system by threating to sue New Line for refusing to pay him for the Treatment—an asset which the Debtor testified he did not disclose when he filed his Schedule B on July 10, 2009 "because I didn't think it had any value."  [Finding of Fact No. 23].  Even if the Debtor did not believe the Treatment had any value on July 10, 2009—and the Court does not believe the Debtor's testimony on this point—there is no question that the Debtor believed the Treatment had value as

of October 7, 2010, when he sent his hostile email to New Line's senior vice president threatening to file suit because New Line would not pay him for "my Treatment."  One simply does not threaten to sue someone else for alleged theft of one's work unless one believes that this work has value.

What the Debtor knew as of October 7, 2010 is extremely important in this Court's "motive to conceal" analysis.  The Debtor unequivocally knew that the Treatment had value as of October 7, 2010.  Thus, while he did not disclose it on July 9, 2009 because "I didn't think it had any value," [Finding of Fact No. 23], he should have disclosed it once he knew that it did have value.  All he needed to do was file an amended Schedule B on October 7, 2010; indeed, his case was still open, so he did not even need to reopen his case to schedule the Treatment.

Yet, the Debtor did not file an amended Schedule B disclosing the Treatment.  There is no question that he had a duty to do so and there is also no question that, by his own testimony, he should have scheduled the Treatment once he knew it had value.  *In re Coastal Plains, Inc.*, 179 F.3d at 210 ("The duty of disclosure in a bankruptcy proceeding is a continuing one. . ."); *In re Castillo*, 508 B.R. 1, 7–8 (Bankr. W.D. Tex. 2014) ("[D]ebtors have an express, affirmative duty to disclose all assets even if there is uncertainty about if those assets are property of the estate."); *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013) ("Applying judicial estoppel under these circumstances recognizes the importance of the bankruptcy debtor's *affirmative and ongoing duty* to disclose assets, including unliquidated litigation interests.") (*emphasis added*).  The Debtor's failure to return to this Court on October 7, 2010 to disclose the Treatment underscores his intent to conceal this asset.  *See Jethroe v. Omnova Sols., Inc.*, 412 F.3d 598, 600 (5th Cir. 2005) ("The obligation to disclose [assets] in bankruptcy proceedings is an ongoing one" and the bankruptcy court properly inferred intentionality when the debtor filed

and pursued claims during the pendency of his bankruptcy case but never amended his petition to include the lawsuit).

There is more. After New Line refused to buckle under to the Debtor's threat to sue in his email of October 7, 2010, the Debtor did in fact carry out his threat to sue New Line. Indeed, he proceeded to file a plethora of lawsuits against New Line, among others, in the District Court. First, on March 28, 2014, the Debtor—together with Holdings—filed suit against New Line and Warner Brothers (the "First Suit"). [Finding of Fact No. 44]. Second, on April 23, 2014, the Debtor—together with Holdings and Gerald D. Brittle—sued New Line, Warner Brothers and three other defendants (the "Second Suit"). [Finding of Fact No. 45]. Third, on August 7, 2015, the Debtor, as the sole plaintiff, filed suit against New Line, Warner Brothers, and three other defendants (the "Third Suit"). [Finding of Fact No. 52]. Fourth, on September 22, 2015, the Debtor, once again as the sole plaintiff, sued New Line, Warner Brothers, and three other defendants (the "Fourth Suit"). [Finding of Fact No. 53]. The complaints that the Debtor filed in all of these suits expressly alleged that the defendants (including New Line) pilfered the Treatment in developing the script for "The Conjuring;" and the relief sought in each of these complaints, among other things, was that damages be awarded for the defendants' improper use of the Treatment to develop the script for "The Conjuring." [Findings of Fact Nos. 44c-d, 45c-d; 52c-d, 53c-d]. In filing all of these suits, the Debtor clearly was taking the position that the Treatment had value. Yet, at no point prior to the filing of any of these lawsuits did the Debtor return to this Court to amend his Schedule B to disclose the Treatment. His actions highlight his intention to conceal the Treatment from this Court, the Trustee, and his creditors.[28]

---

[28] In the First Suit and the Second Suit, there were plaintiffs other than the Debtor, but the complaints did not contain any allegations that one of the plaintiffs *other than the Debtor* owned the Treatment and that therefore that particular plaintiff—and not the Debtor—was seeking damages for the alleged misappropriation of the Treatment. Thus, the Debtor cannot contend that the reason he failed to return to this Court when he filed the First Suit and the

There is even more.  After the Debtor filed the First Suit and the Second Suit, the District Court consolidated these suits and then, on October 28, 2014, dismissed them in favor of arbitration.  [Finding of Fact No. 46a].  Thereafter, the Debtor, New Line and Warner Brothers underwent arbitration in California; extensive discovery was conducted, including depositions; and a full evidentiary hearing was held, which included testimony and the introduction of 497 exhibits.  [Finding of Fact No. 47].  On February 5, 2015, the arbitrator issued a 32-page written decision that ruled in favor of New Line and Warner Brothers on every point in dispute. [Finding of Fact No. 48].  The Debtor then appealed this ruling, [Finding of Fact No. 49], and this appeal is pending as of the date of this Opinion.

The Court reviews these events—which took place between October 26, 2014 and February 5, 2015—because of certain testimony that the Debtor gave at the Hearing. Specifically, the Debtor testified that it was only in late 2014 that he first became aware that the Treatment had value.  [Hr'g Tr. 125:8–9; 126:13–20; 147:3–12, Dec. 1, 2015].  Assuming that the Debtor's testimony is really true—and this Court does not believe him on this point—his own words provide a further basis for this Court to find that the Debtor had a motive to conceal. This is so because if he really had an "Ah Hah" moment in the fall of 2014 and concluded that the Treatment had value, then he had a duty to return to this Court *at that time* and seek to reopen his case to amend his Schedule B and disclose the Treatment.  *Jethroe,* 412 F.3d at 600–01; *Kimberlin*, 520 F. App'x at 314.  He had a duty to take this action so that the Trustee could administer this asset—which would have necessarily included stepping into the shoes of the

---

Second Suit is because he believed one of the other plaintiffs owned the Treatment.  And, if the Debtor did try to offer such an explanation, it would ring hollow for two reasons.  First, he has testified that he has always owned the Treatment.  [Hr'g Tr. 124:19–23, Dec. 1, 2015].  Second, the Debtor was the only plaintiff in the Third Suit, [Finding of Fact No. 52] which—like the First Suit and Second Suit—sought damages for the alleged misuse of the Treatment.  Yet, when he filed the Third Suit, the Debtor still did not return to this Court to disclose the Treatment. [Finding of Fact No. 52f].

Debtor in the arbitration.  Instead, what did the Debtor do when he had his "Ah Hah" moment in late 2014 and realized that the Treatment had value?  He did <u>not</u> seek to reopen his case in order to disclose the Treatment and its value to the Trustee and his creditors, but rather plowed forward on his own in the arbitration hoping to convince the arbitrator to grant him, and only him (to the exclusion of the Trustee and his creditors), monetary damages.  These actions further underscore his intent to conceal the Treatment.

But, there is even more.  After the arbitrator ruled against the Debtor on February 5, 2015, what did the Debtor do?  He did <u>not</u> seek to reopen his case at that time to disclose the Treatment.  Rather, he appealed the arbitration decision as a tactic to convince New Line and Warner Brothers to negotiate a settlement with him—and him alone (to the exclusion of the Trustee and his creditors).  When this tactic failed—New Line and Warner Brothers refused to be bullied into a settlement—what did the Debtor do next?  He did <u>not</u> seek to reopen his case at that time to disclose the Treatment.  Rather, he had his attorney, Sanford Dow, write a letter threatening more lawsuits against New Line and Warner Brothers.  [Finding of Fact No. 50].  However, this letter contained more than a threat.  That was the "stick."  The "carrot" was a settlement proposal that, at least in this Court's view, might well constitute a bankruptcy crime and most assuredly undermines any argument of the Debtor that his failure to disclose the Treatment was inadvertent.

Here is why.  In his letter to New Line's attorney, Dow makes the following assertions:

Additionally, Mr. DeRosa-Grund intends to files a concurrent motion to reopen his personal bankruptcy in light of the fact that the above-referenced treatment should have been listed as an asset in the original bankruptcy matter, but inadvertently was not.  The reopening will address that inadvertent error as his treatment was, and remains, an asset of the bankruptcy estate.  Mr. DeRosa-Grund and I have already met with the U.S. Bankruptcy Trustee who was originally involved in the bankruptcy, and have explained the facts and circumstances to him.  Based on our conversations, he has authorized us to convey to the court that

he will not oppose the reopening of the bankruptcy. A copy of the motion to reopen the bankruptcy is also attached.

Finally, Mr. DeRosa-Grund and [Holdings] intend to file a motion with the bankruptcy court requesting a Show Cause Order. Pursuant to the Deal Memo, and the bankruptcy court's order approving same, Safran and [Holdings] were an supposed to be indivisible producing team. When New Line refused to employ and compensate [Holdings] as producer on any and all sequel productions, New Line was clearly in contempt of the bankruptcy court's order. Because the foregoing original order of the bankruptcy court was part of a core proceeding, this adversarial proceeding cannot be adjudicated in any other form (i.e. mediation), as bankruptcy courts have sole and exclusive jurisdiction over core proceedings related thereto.

[Finding of Fact No. 50]; [New Line Ex. No. 15].

After setting forth the Debtor's intention to return to this Court to seek to reopen his case, disclose the Treatment, and request this Court to issue a show cause order to New Line, Dow then made the following offer to New Line: "*If a settlement can be reached, my clients [which include the Debtor] will agree to withdraw all current and contemplated litigation*." [*Id.*] [*emphasis added*].

Dow sent this letter on July 20, 2015. On this date, the only litigation pending was the arbitration appeal. [Finding of Fact No. 50]. The Debtor had certainly not filed the Motion to Reopen; indeed, he would not do so for another 63 days. [Finding of Fact No. 54]. Thus, the only reasonable conclusion that one could draw from Dow's proposal is this: if a settlement could be reached to the Debtor's satisfaction, then the Debtor would dismiss his appeal of the arbitrator's ruling and, additionally, would not seek to reopen his case so as to disclose the Treatment and seek a show cause order against New Line. Once again, the Debtor's actions— this time, through the actions of his attorney[29]—reveal a clear and unequivocal financial motive

---

[29] An attorney's actions are imputed to the client. *Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 396, 113 S. Ct. 1489, 1499, 123 L. Ed. 2d 74 (1993) ("[W]e have held that clients must be held accountable for the acts and omissions of their attorneys"); *In re Moser*, 347 B.R. 471, 472 (Bankr. W.D.N.Y. 2006) ("As a general rule, the actions and inactions of an attorney are imputed to a client… the action 'of counsel is

to conceal the Treatment from this Court, the Trustee, and the Debtor's creditors. Essentially, the proposal in the letter was an attempt at extortion, with the Debtor effectively saying to New Line the following: "Listen, New Line, if you will only pay me the money I deserve for the Treatment, I will not tell the Bankruptcy Court, the Trustee, or my creditors about the Treatment nor will I sue you in Bankruptcy Court. We can then both quietly walk away with each of us having achieved our respective objectives: you will have unfettered use of the Treatment to generate revenues from making sequels of 'The Conjuring' and I will become a millionaire from your generous payment while continuing to cheat the bankruptcy system by ensuring that none of these funds fall into the hands of those creditors holding unpaid claims from my Chapter 7 case." *See* 18 U.S.C. § 152(6).**[30]**

New Line, to its credit, did not take the bait. Indeed, its attorney (O'Connor) quite justifiably testified at the Hearing that he was "appalled" when he read Dow's letter. [Finding of Fact No. 51]; [Hr'g Tr. 15:23, Dec. 2, 2015]. And, when New Line did not buckle under and pay off the Debtor, what did the Debtor do? He did <u>not</u> seek to reopen his case at that time to disclose the Treatment. Rather, he tried yet again to bring New Line to the negotiating table *sub rosa* by filing the Third Suit on August 7, 2015. [Finding of Fact No. 52]. But, this ploy failed, as New Line (and other defendants sued in the Third Suit) refused to settle with the Debtor.

Apparently, at this point, Dow (the Debtor's attorney of record) and the Debtor had some disagreement about prosecuting the Third Suit because they sought dismissal of this suit on August 28, 2015—which the District Court granted on the same day. But then the Debtor,

---

imputed to his or her client, who is bound thereby, under the rule that the acts and omissions of an attorney acting within the scope of his or her authority are regarded as the acts of the person he or she represents.' ") (citing 7 Am. Jur. 2d *Attorneys at Law*, § 157 (1997)).

[30] 18 U.S.C. § 152 is entitled "Concealment of Assets: False Oaths and claims; Bribery." Subsection 6 sets forth that "a person who… knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11 shall be fined under this title, imprisoned not more than 5 years, or both."

representing himself *pro se*, filed the Fourth Suit three weeks later on September 22, 2015 seeking the same relief against the same defendants as the Third Suit. [Findings of Fact Nos. 52(d) & 53]. Then, one day later, on September 23, 2015, the Debtor filed the Motion to Reopen. [Finding of Fact No. 54].

Under all of the above-described circumstances, it strains credulity to believe that the Debtor now comes to this Court with the good faith intention of "trying to do the right thing" [Hr'g Tr. 13:8, Dec. 1, 2015], by reopening his case to disclose the Treatment. Rather, the Debtor's timing of returning to this Court on September 23, 2015 demonstrates, to an extreme degree, a bad faith intention to play fast and loose with the judicial system. The Debtor only filed the Motion to Reopen on September 23, 2015 because, having failed for almost six years— both in and out of the courtroom—to obtain payment from New Line for the Treatment, he now wants the Trustee to lay claim to ownership of the Treatment, monetize this asset, and then, after paying off remaining allowed claims and the Trustee's fee, remit the remaining proceeds to himself. If the Debtor's timing in now returning to this Court with the Motion to Reopen does not demonstrate the Debtor's motive to conceal, then nothing does. *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 262 (5th Cir. 2012) ("[T]he motivation sub-element is almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court. Motivation in this context is self-evident because of potential financial benefit resulting from the nondisclosure") (quoting *Thompson v. Sanderson Farms, Inc.,* No. 3:04CV837–WHB–JCS, 2006 U.S. Dist. LEXIS 48409, at *12–13 (S.D. Miss. May 31, 2006).

In sum, given all of the circumstances discussed above, this Court finds that there was no inadvertence by the Debtor's failure to disclose the Treatment. Therefore, while the Court will reopen this case in order to allow the Trustee to administer the Treatment, the Debtor will be

judicially estopped from receiving any benefit from the Trustee's sale or other disposition of the Treatment, or any rights associated therewith (such as filing suit to recover damages for any misappropriation of the Treatment).

### G. The Debtor's Position that His Failure to Disclose the Treatment on His Original Schedule B was Due to Reliance Upon His Bankruptcy Attorney Does Not Make the Debtor's Nondisclosure Inadvertent

During the Hearing, the Debtor gave testimony suggesting that his failure to disclose the Treatment on his initial Schedule B was due to the fact that his attorney (Nelson Hensley) filled out the Schedules and that he (i.e. the Debtor) relied upon his attorney's work. [Hr'g Tr. 91:19–20, Dec. 1, 2015]. The thrust of the Debtor's testimony was that his failure to disclose was an error on the part of his attorney—which, in his view, means that his failure to disclose was "inadvertent." There are two reasons why this position does not stand.

First, the Debtor admitted that before signing his Schedules, he reviewed them with his attorney. [Finding of Fact No. 15]. The Debtor also admitted that he (i.e. the Debtor) signed the last page of his Schedules—namely the Declaration Concerning Debtor's Schedules—under penalty of perjury, representing under oath that they were true and correct. [Finding of Fact No. 15]; [Debtor's Ex. No. 2, p. 31 of 31]. It is Black Letter law that a debtor who reviews his Schedules with his attorney cannot blame his attorney for inaccuracies in the Schedules—even if the debtor is purportedly inexperienced with financial affairs. *See In re Sholdra*, 249 F.3d 380, 383 (5th Cir. 2001); *see also Estel v. Bigelow Mgmt., Inc.*, 323 B.R. 918, 923 (E.D. Tex. 2005) (holding that the "argument that it is all his lawyer's fault is not persuasive"); *In re Hansen*, 325 B.R. 746, 760 (Bankr. N.D. Ill. 2005). Thus, the Debtor, not Hensley, is responsible for his inaccurate representation on his Schedule B that he does not own the Treatment. Such an inaccuracy precludes the Debtor from establishing inadvertence. *See Love* 677 F.3d at 262

("[T]he motivation sub-element is almost always met if a debtor fails to disclose a claim or possible claim to the bankruptcy court. Motivation in this context is self-evident because of potential financial benefit resulting from the nondisclosure") (internal quotations omitted).

Second, even if the Debtor had not reviewed the Schedules with Hensley before signing them, but rather simply signed them in reliance on the answers that he claimed Hensley inputted on the Schedules, such circumstances would still not constitute inadvertence. This is so because of Supreme Court precedent that precludes a client from escaping the legal consequences of his attorney's negligent conduct:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'

*Link v. Wabash R. Co.*, 370 U.S. 626, 633-34, 82 S. Ct. 1386, 1390, 8 L. Ed. 2d 734 (1962), (quoting *Smith v. Ayer*, 101 U.S. 320, 326, 25 L.Ed. 955); *see Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship*, 507 U.S. 380, 381, 113 S. Ct. 1489, 1491, 123 L. Ed. 2d 74 (1993) (stating that "the proper focus is upon whether the neglect of respondents *and their counsel* was excusable").

Here, the Debtor freely chose Hensley to represent him in his Chapter 7 case. [Finding of Fact No. 14]. As one court has said in rejecting a debtor's attempt to prove inadvertence by blaming his attorney: "[Y]ou take them as you get them. If [the debtor] choose poorly in his selection of counsel, such does not provide relief here." *Estel*, 323 B.R. at 923. Therefore, the Debtor is bound by the acts of Hensley—including Hensley's answers to the questions posed on Schedule B. Thus, even if Hensley himself filled in the information on Schedule B—which

clearly did not disclose that the Debtor owned the Treatment, [Finding of Fact No. 21]—the Debtor is bound by Hensley's answers.  The Debtor therefore cannot establish that the failure of his attorney to disclose the Treatment on Schedule B constitutes inadvertence on the Debtor's part.  *See, e.g., Hibernia Nat'l Bank v. Perez*, 124 B.R. 704, 710 (E.D. La. 1991) *aff'd sub nom. Matter of Perez*, 954 F.2d 1026 (5th Cir. 1992) ("[T]he advice of counsel is not a defense when it is transparently plain that the property should be scheduled.") (internal quotation marks and citation omitted).  To allow the Debtor to establish inadvertence under these circumstances would—using the Supreme Court's language—"be wholly inconsistent with our system of representative litigation." *Link*, 370 U.S. at 634.

### H. The Debtor's Position that He Did Not Have the Financial Means to File the Motion to Reopen Any Earlier is Wholly Unpersuasive and Therefore Does Not Make the Debtor's Nondisclosure of the Treatment Inadvertent

At the Hearing, after the Debtor testified that it was in late 2014 that he concluded the Treatment had value, New Line's counsel asked him why he waited until the fall of 2015 to file the Motion to Reopen.  The Debtor responded that he "did not have the financial resources" to seek to reopen the case until September of 2015.  [Hr'g Tr. 126:22–25, Dec. 1, 2015].  This is the only reason that the Debtor gave as to why he waited approximately one year between concluding that the Treatment has value and returning to this Court to disclose the Treatment through the filing of the Motion to Reopen.

The Debtor's explanation for this year-long delay is, to put it mildly, hard to swallow. During this year-long gap between "discovering" that the Treatment had value and his filing of the Motion to Reopen, the Debtor was being represented by very high-powered attorneys who were prosecuting the First Suit and the Second Suit before District Judge Rosenthal, [Findings of Fact Nos. 44 & 45]; and then, when she dismissed these suits in favor of arbitration, the Debtor

was being represented by two attorneys from Connecticut at this arbitration. [New Line Ex. No. 13, p. 1, which sets forth the names of the attorneys representing the Debtor in the arbitration]. And then, after the arbitrator ruled against the Debtor, the Debtor, through the same attorney who filed the First Suit and the Second Suit (i.e. Dow), filed the Third Suit in the District Court [Finding of Fact No. 52]. These attorneys were assuredly not working pro-bono for the Debtor; somehow, he was paying them.

Moreover, on July 2, 2014, New Line remitted a check payable to the Debtor and Holdings for the amount of $750,000.00. [Finding of Fact No. 58]. The Debtor therefore could have easily used some of these funds to retain counsel to file the Motion to Reopen at a much earlier date than September 23, 2015. Indeed, when the Debtor, according to his own testimony, had his "Ah Hah" moment in late 2014 and concluded the Treatment had value, he surely had access $750,000.00 that he had received on July 2, 2014 to retain counsel for filing the Motion to Reopen at that time.

Finally, the Debtor was both the manager and the executive chairman of Holdings, [Hr'g Tr. 106:15–107:4; 110:10–13, Dec. 1, 2015]; he assuredly was receiving compensation in these capacities during the year-long hiatus between his "discovery" that the Treatment had value and his filing the Motion to Reopen.

In sum, it strains credulity that up until September 23, 2015, the Debtor lacked the financial wherewithal to pay the $260.00 filing fee for filing the Motion to Reopen and to retain counsel to draft and prosecute this motion; to allow the Debtor to establish inadvertence on this flimsy basis would be absurd. The Court simply does not believe the Debtor's testimony that he was impecunious during the one-year gap between the Debtor's "discovery" that the Treatment had value and his filing of the Motion to Reopen. Rather, the Court finds that the one-year delay

in filing the Motion to Reopen was due *not* to lack of funds, but rather to lack of honesty.  The Court finds that the Debtor deliberately held off returning to this Court because he hoped, by prosecuting multiple suits against New Line, [Findings of Fact Nos. 44, 45, & 52], participating in arbitration, [Findings of Fact Nos. 47 & 48], as well as threatening more suits, [Finding of Fact No. 50], that New Line and he could quietly reach a settlement whereby New Line would pay him a substantial amount for the Treatment and he would slip away with the funds in his pocket and prevent the funds from ever being distributed to those creditors holding unpaid claims in his Chapter 7 case.  The Debtor's strategy was a woeful failure.

### I. Judicial Estoppel Bars the Debtor from Ever Benefitting from the Trustee's Administration of the Treatment

Because this Court will reopen the Debtor's case so that the Debtor can amend his Schedule B to disclose the Treatment, the Trustee will have a duty to administer this asset for the benefit of creditors; stated differently, the Trustee's duty will be to sell or otherwise dispose of the Treatment and use the proceeds to pay remaining unpaid claims—in part, if not in full.  *See Matter of Troy Dodson Const. Co., Inc.*, 993 F.2d 1211, 1216 (5th Cir. 1993).  Normally, the Trustee would also owe a duty to the Debtor to ensure he received any excess funds after all creditors are paid in full.  *See In re Kazis*, 257 B.R. 112, 114 (Bankr. D. Mass. 2001) ("The Trustee also owes a duty to the Debtor to maximize value, particularly here where there is a real chance that all creditors may be paid in full and the Debtor may receive funds back."); *see also In re Kay*, 223 B.R. 816, 821 (Bankr. M.D. Fla. 1998) ("[A]ll surplus funds are returned to the Debtor.").  Thus, the Debtor, as a party in interest would typically have standing to object to any sale or disposition of the Treatment the Trustee might propose in the future if the Debtor believed that the Trustee's proposed disposition was not generating as many proceeds as possible.  *In re Hutchinson*, 5 F.3d 750, 756 (4th Cir. 1993) (noting that a party in interest is

66

"generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings") (citation omitted); *In re Delta Underground Storage Co., Inc.*, 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994) (noting that a party in interest "has been held to refer to anyone who has a practical stake in the outcome of a case").

Here, however, under *Reed*, the Debtor has lost his standing to object to any proposed disposition of the Treatment by the Trustee because the Debtor is barred from receiving any benefit due to his failure to disclose this asset. *See Reed,* 650 F.3d at 573. Prohibiting the Debtor from ever receiving any benefit from the Trustee's administration of the Treatment fulfills the fundamental objective of the doctrine of judicial estoppel: "The purpose of the doctrine is to protect the integrity of the judicial process, by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest." *In re Coastal Plains, Inc.*, 179 F.3d at 205 (internal quotation marks, parentheses, brackets and citation omitted).

In the case at bar, the Debtor like many film-makers, has played fast and loose with the truth in order to create a picture upon which this Court would issue a ruling that would keep the door open for the Debtor to personally benefit from the Treatment. His strategy has not worked. The Court is now closing—indeed slamming—the door shut to the possibility that the Debtor can ever benefit from the Trustee's administration of the Treatment. This Court wants to emphasize to the Debtor here and now that if any excess proceeds remain after the Trustee administers the Treatment and completely pays off all claims and his own fee, then this Court will direct that these excess proceeds go *not* to the Debtor, but rather to the United States or be made available to public interest, charitable, educational, and other public service organizations. *See In re Premiere Holdings of Texas LP*, 393 B.R. 156, 159 (Bankr. S.D. Tex. 2008); *see also In re Xpedior Inc.*, 354 B.R. 210, 239 (Bankr. N.D. Ill. 2006). In fact, this Court took this approach in

*Jackson*—where the debtor lied about his ownership of a patent—and the Fifth Circuit endorsed this approach regarding distribution of excess proceeds. *In Re Jackson*, 2012 WL 3071218, *aff'd* per curiam by the Fifth Circuit on direct appeal at *In Re Jackson*, 574 F. App'x 317, 320 (5th Cir. 2014) ("The bankruptcy court's ruling does not allow [the defendants in undisclosed lawsuit initiated by the debtor] to get off scot-free. The estate can pursue the claims [the debtor] asserted, and if successful, the bankruptcy court ordered that any recovery exceeding the $40,538.00 in remaining claims would either escheat to the United States or be made available to public interest, charitable, educational, and other public service organizations.")

This Court will do even more to ensure that the Debtor's persistent, pernicious, perfidy towards the judicial system stops.  It is possible—although unlikely—that the Trustee, after investigating the history of the Treatment and the litigation over this asset, concludes that the Treatment either has no value or is of inconsequential value.  Stated differently, it is possible that the Trustee concludes that he cannot administer the Treatment for the benefit of the Estate. Under this scenario, the normal result would be that the Treatment would be abandoned to the Debtor pursuant to § 554(c) once the case was closed.  *In re Nagy*, 432 B.R. 564, 568 (Bankr. M.D. La. 2010) ("Abandonment takes place by operation of law when a case is closed under Bankruptcy Code section 554(c), which deems abandoned to the debtor *any* scheduled property of the estate that is unadministered at the close of the case.") (internal quotation marks and citation omitted).  Indeed, "[p]roperty abandoned under [§] 554 reverts to the debtor, and the debtor's rights to the property are treated as if no bankruptcy petition was filed."  *Kane v. Nat'l Union Fire Ins. Co.,* 535 F.3d 380, 385 (5th Cir. 2008).  Although the Debtor is barred under *Reed* from receiving any benefit from the Trustee's administration of the Treatment, the Debtor could still wind up with title to this asset revesting in his name.  Such a result would accord him

the standing that he needs to file yet another lawsuit against New Line once again alleging that New Line has wrongfully appropriated the Treatment and needs to pay him damages for so doing.  Under this scenario, there is a possibility that the Debtor could end up pocketing money himself.  Such a result would undermine the very purpose of judicial estoppel.

Fortunately, the Code allows this Court to prevent this scenario from occurring.  Section 554(c) sets forth that property of the estate that a Trustee abandons is deemed abandoned to the debtor unless "the court orders otherwise."  Given the Debtor's perjurious conduct in this case, and his penchant for filing multiple suits in the District Court, [*See* Findings of Fact Nos. 44, 45, 52, & 53], this Court, as part of its decision to reopen this case, will "order otherwise" by barring the Trustee from ever abandoning the Treatment.  If necessary, the Court will close this case with the Treatment simply remaining part of the Estate.  The Court will take this action using its powers under § 105(a).  *In re Trevino*, 535 B.R. 110, 132 (Bankr. S.D. Tex. 2015) ("One of the primary functions of § 105(a) is to 'prevent an abuse of process.' A bankruptcy court has broad authority to take necessary or appropriate actions to prevent an abuse of process.") (citing *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 375, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007)). Whatever else happens, this Debtor will never again be able to have a scintilla of an argument that he has standing to bring suit on the grounds that he has an interest in the Treatment and that therefore he is entitled to damages for its misappropriation.  It is time to put a stop to the Debtor's vexatious and fraudulent litigation tactics.

Finally, after the Debtor amends his Schedule to list the Treatment, this Court will also invoke its powers under § 105(a) to enjoin the Debtor from amending his Schedule C to claim that the Treatment is exempt property to which he is entitled.  Not only does § 105 allow this Court to issue orders "to prevent an abuse of process;" this section authorizes the Court to issue

"any order… that is necessary or appropriate to carry out the provisions of this title." Here, if the Debtor, after amending his Schedule B to list the Treatment, could then amend his Schedule C to exempt this asset, he would be defeating the very purpose of the principle of judicial estoppel: he would be obtaining a financial benefit for himself despite his fraudulent conduct of hiding the existence of the Treatment in the first place. This Court will not allow such a result to occur, as it would constitute an abuse of process. Indeed, this Court will not be the first court to deny an exemption based upon a debtor's misconduct. *In re Colvin,* 288 B.R. 477, 483 (E.D. Mich. 2003) ("In this case, it is commensurate with the debtors' conduct in failing to disclose their $10,000 tax refund to deny to them their claim of exemption in that refund. As the Seventh Circuit observed, if debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive. . .") (internal quotations and citations omitted); *In re Talmo*, 185 B.R. 637, 644 (Bankr. S.D. Fla. 1995) ("Despite the permissive language of the rule, the Court has the discretion to not permit amendments: (i) if the proposed amendment would prejudice creditors; (ii) if the debtor has acted in bad faith; or (iii) if the debtor concealed assets."). In short, the Debtor will not be allowed to do an "end run" around the principle of judicial estoppel by exempting the Treatment after amending his Schedule B to disclose this asset.

## V. CONCLUSION

It is noteworthy that after this Court entered an order for relief in this case, PSG and Gordon filed a complaint to determine dischargeability against the Debtor and successfully obtained an order from this Court declaring that the $576,266.70 New York Judgment was a nondischargeable debt. [Findings of Fact Nos. 25 & 26]. The $576,266.70 New York Judgment arose from the Debtor's fraudulent acts relating to a television program about poker. [Finding of

Fact No. 25]. The game of poker necessarily requires a participant to take risk in order to win a pot of cash.

In the case at bar, the Debtor decided to play poker with this Court when he filed the Motion to Reopen because he submitted himself for cross examination under oath at the Hearing. He took this risk in the hope that he would convince this Court to reopen his case so that the Trustee can administer the Treatment, pay off remaining creditors, and leave enough money on the table so that the Debtor could rake in a substantial amount of cash. Unfortunately for the Debtor, his gamble has not paid off. Based upon his testimony at the Hearing, and the exhibits introduced and the testimony adduced by New Line, and a review of the Debtor's Schedules and SOFA, this Court finds the Debtor to be a conniving and dissembling individual whose failure to schedule the Treatment was anything but inadvertent. His explanations of why he did not initially disclose the Treatment in July of 2009, and why he did not get around to disclosing it to this Court until September of 2015, are nothing more than fictionalized concoctions that he conjured up as a litigation strategy for the Hearing.

Like the poker player in the old westerns who gets shot for his cheating ways, the Debtor here has cheated the bankruptcy system and will now suffer the consequences. Specifically, while this Court will reopen the Debtor's case, the Court will bar him from ever benefiting from the Trustee's sale or other disposition of the Treatment. And, for his efforts to game the bankruptcy system, this Court will refer him to the United States Attorney for the Southern District of Texas for that office to investigate whether his conduct amounts to a bankruptcy crime worthy of prosecution. The Debtor's conjuring up various and sundry explanations to justify his lengthy nondisclosure of the Treatment could cost him dearly in cash and might cost

him dearly in his freedom.   Sir Walter Scott's observation is unquestionably applicable to the Debtor: "Oh what a tangled web we weave, when first we practise to deceive."[31]

An order consistent with this Memorandum Opinion will be simultaneously entered on the docket.

Signed: January 22, 2016

_____

Jeff Bohm
Chief United States Bankruptcy Judge

---

[31] Sir Walter Scott, *Marmion, Canto vi. Stanza 17*. The Court notes that the word "practise" is not misspelled in this quotation.